747 F.2d 1553
 223 U.S.P.Q. 1089
 J.P. STEVENS & CO., INC., Badische Corporation, and
Burlington Industries, Inc., Appellants/Cross-Appellees,
v.
LEX TEX LTD., INC., Appellee/Cross-Appellant.
 Appeal Nos. 84-754 to 84-761.
 United States Court of Appeals,
Federal Circuit.
 Nov. 9, 1984.
 
 D. Dennis Allegretti, Chicago, Ill., argued for appellant/cross-appellee Burlington; Robert C. Ryan and Mark T. Banner, Chicago, Ill., William K. West, Jr. and James T. Hosmer, Washington, D.C., Richard D. Elliott, Greensboro, N.C., of counsel.
 David Rabin, Greensboro, N.C., and Stuart I. Friedman, New York City, for appellant Badische Corp.
 Francis T. Carr, New York City, argued for appellant/cross-appellee J.P. Stevens. With him on the brief were Robert D. Fier and James Galbraith, New York City.
 Michael T. Frimer, New York City, of counsel.
 Stuart I. Friedman, New York City, argued for appellant/cross-appellee Badische.
 James L. Armstrong, III and James W. Crabtree, Charlotte, N.C., argued for appellee/cross-appellant.
 Robert C. Miller, Arlington, Va., was on the brief for appellee/cross-appellant.
 Before MARKEY, Chief Judge, and DAVIS, MILLER, SMITH, and NIES, Circuit Judges.
 MARKEY, Chief Judge.
 
 
 1
 Appeal from a final judgment of the District Court for the Southern District of Florida holding infringed, not invalid, and not unenforceable product claims 24, 26-27, and 31 of U.S. Patent No. 3,091,912 ('912 patent), issued on June 4, 1963 to Messrs. Stoddard and Seem, ultimately assigned to Lex Tex Ltd., Inc. (Lex Tex), and now expired. Burlington, Stevens, and Badische (Burlington) appeal those parts of the judgment holding that the claims were not invalid under 35 U.S.C. Secs. 102 and 103, that Lex Tex purged itself of misuse as of May 31, 1977, and that the claims were not unenforceable due to fraud on the Patent and Trademark Office (PTO). Lex Tex cross-appeals, arguing that its misuse purge occurred earlier than May 31, 1977. We reverse the portion of the final judgment holding that the claims in suit were not unenforceable.
 
 BACKGROUND
 A. History of the Litigation
 
 2
 This appeal evolved from litigation starting in 1969, involving at least six patents and fifty accused infringers in the yarn treating industry. In 1974, the district court for the Southern District of Florida, in which the cases had been consolidated, granted summary judgment against Lex Tex on the basis of its misuse of the '912 patent and other patents in licensing. 398 F.Supp. 31, 182 USPQ 523, mod., 541 F.2d 1127, 192 USPQ 241 (5th Cir.1976), cert. denied, 433 U.S. 910, 97 S.Ct. 2976, 53 L.Ed.2d 1094 (1977).
 
 
 3
 Lex Tex sued Burlington, alleging purge of misuse and infringement after the purge. The cases were transferred to the Southern District of Florida, where separate trials were held in this order: (1) without a jury, on the purge issue, resulting in a judgment that purge was achieved as of May 31, 1977; (2) with a jury, on the validity issue under Secs. 102 and 103, resulting in a hung jury; (3) without a jury, on the equitable defenses of "fraud on the PTO", laches and estoppel, resulting in a judgment for Lex Tex; (4) with a jury, on the validity issue under 35 U.S.C. Secs. 102 and 103, resulting in a judgment for Lex Tex; and (5) with a jury, on damages, resulting in an award to Lex Tex of nearly $8.8 million, plus interest.
 
 
 4
 The judgment on the equitable defenses was accompanied by written findings and conclusions, in which the district court determined that Stoddard and Seem (the '912 applicants) knew of and did not disclose during prosecution (1957 through 1963) British Patent No. 710,082 to Weiss (Weiss) and Italian Patent No. 531,481 to DaGasso (DaGasso). The court further determined, however, that there was no clear and convincing evidence of materiality or intent and, hence, no fraud on the PTO.[1]
 
 B. The '912 Patent
 
 5
 The '912 patent relates to reprocessing "torque stretch yarns", produced by twisting a multifilament yarn, heat setting the twist, and reverse twisting. Production of torque stretch yarns was the subject of three basic "single heater" patents involved in earlier phases of the litigation.
 
 
 6
 Torque stretch yarns possess certain properties that the processes claimed in the '912 patent were designed to improve by simultaneously applying heat and tension to the yarn in whatever correlation is required to produce desired effects. Different correlations produce different effects. Process claim 1 reads:
 
 
 7
 1. The method of processing multifilament "torque stretch yarn" whose stretch characteristics have been set at a given temperature comprising the steps of continuously advancing the yarn, controlling the degree of tension in said travelling yarn in at least one portion of its continuous travel, said tension being below the breaking tension of the structural elements of the yarn, heating said yarn during said portion of its continuous travel to a temperature not substantially greater than said given temperature and correlating the controlled tension and the heat imparted to said yarn with the tensile force necessary to extend the yarn to the limit of its stretch characteristics and the tensile force necessary to extend the yarn to the yield point of the structural elements of the yarn to thereby control the physical characteristics in the reprocessed yarn.
 
 
 8
 Other process claims specify the correlating criteria, add the step of controlling tension in a second portion of the yarn's travel, or add a process of making torque stretch yarn from multifilament yarn before performing the process set forth in claim 1. The process claims were originally in suit but were withdrawn after the Board opinion in a PTO reissue proceeding, discussed infra, determined that most of them do not avoid the prior art.
 
 
 9
 The yarns produced by the processes of the '912 patent are asserted to have uniform characteristics throughout their length. Moreover, the tendency of torque stretch yarn randomly to "pigtail", i.e., the tendency of groups of opposed spiralled formations to twist about themselves, is described as lessened. Product claims 24, 26, 27, and 31, the only claims in suit, cover the yarn produced by the foregoing processes, though not couched in product by process terminology. Claim 24 reads:
 
 
 10
 24. A processed "torque stretch yarn" characterized by uniform reorientation of the structural elements of the yarn components to thereby exhibit substantial uniformity throughout its length in its latent and manifest physical characteristics of shape, luster, cross-sectional area, texture, dimensional stability, torque, resilience, residual shrinkage, stretch, recovery from stretch, and elasticity, said yarn having substantially balanced torque and moderate bulk and a plurality of individual filaments manifesting a plurality of partially spiralled formations of opposed direction which remain separate from one another without tending to twist upon themselves or pigtail when relaxed, said formations being yarn-set.
 
 
 11
 Claim 26 is identical to claim 24 except that the bulk is "high" instead of "moderate" and the filaments "infrequently tend to ... pigtail when relaxed". Claim 27 is identical to claim 24 except that the bulk is "high". Claim 31 reads:
 
 
 12
 31. A reprocessed torque stretch yarn having in at least a portion of its length a filament have substantially regular opposed partially spiralled formation, the spirals of said filament being less than one convolution.
 
 C. Weiss and DaGasso Patents
 
 13
 The Weiss patent teaches that undesirable characteristics of stretch yarn made by a prior twist-heat set-untwist batch method can be lessened by stretching the yarn from 10% to 70% and steaming it in the stretched state for up to 30 minutes. The Weiss patent discloses a batch process, as opposed to the continuous process of the '912 patent. The Weiss patent had counterparts in a number of foreign countries, including the United States (U.S. Patent No. 2,765,505, issued on October 16, 1956).
 
 
 14
 DaGasso teaches subjecting yarn made by a continuous twist-heat set-untwist method to a second continuous process involving heat treatment followed by a drawing action. The parties agree and the district court found that during heat treatment the yarn is under positive tension.
 
 D. Prosecution History of the '912 Patent
 
 15
 The application that resulted in the '912 patent ('912 application) was filed on April 19, 1957, with process claims 1-23, product claims 24-29, and apparatus claims 30-32, to which a fourth apparatus claim 33 was added by amendment before the examiner's first Office Action. Pursuant to a restriction requirement in the first Office Action, apparatus claims 30-33 became claims 1-4 of Continuation-In-Part (CIP) application 682,724, filed September 9, 1957 and issued on February 19, 1963, as U.S. Patent No. 3,077,724 ('724 patent). The specification of application 682,724 ('724 application) is essentially identical to that of the '912 application.
 
 
 16
 In the second Office Action on the '912 application, claims 1-23 and 25-29 were indicated as allowable. Only product claim 24 (subsequently issued) was rejected as unpatentable, on U.S. Patent No. 2,411,132 to Hawthorne. Subsequent office actions involved rejections of added product claim 37 (subsequently issued as claim 31) on U.S. Patent No. 2,564,245 to Billion and, later, on U.S. Patent No. 2,909,028 to Comer et al., and of added product claim 35 (subsequently issued claim 30) on U.S. Patent No. 2,211,211 to Finlayson in view of Belgian Patent No. 545,983 to Chavanoz.
 
 E. Reissue Proceeding
 
 17
 After trial of the purge issue, but before the first trial on the validity issue, the district court issued an order: requiring Lex Tex to file application for reissue of the '912 patent in the PTO; permitting Lex Tex to modify the reissue oath to preserve its position in the litigation; instructing the PTO "to use the expedited new reissue procedure"; and permitting defendants to participate in the PTO proceedings.[2]
 
 
 18
 The district court later: ordered the parties not to raise at trial any patentability issue which could have been but was not presented in the reissue proceeding; reiterated its position that the PTO was to serve essentially as a Special Master on validity; and stated that the examiner's Report was to be treated in the trial of the validity issue as prima facie evidence of the facts it contained. The court said the reissue result was not needed for any conclusion on fraud because "the fraud or misrepresentation issue is a legal not technical one, and is equally within the expertise of the Court".
 
 
 19
 The reissue examiner rejected all but seven claims in view of Weiss or DaGasso. Product claims 24-28 and 31 were rejected under 35 U.S.C. Sec. 103 on either Weiss or DaGasso.
 
 
 20
 On appeal to the Board, claims 2, 9-14, 16, 24-29 and 31 were considered to avoid Weiss and DaGasso, while claims 1, 3-8, 15, 17-23, and 30 were viewed as not avoiding the prior art.[3]
 
 ISSUE
 
 21
 Whether the claims in suit are unenforceable because of inequitable conduct before the PTO.[4]
 
 OPINION
 
 22
 A. "Inequitable Conduct"
 
 
 23
 "Common law fraud" requires (1) misrepresentation of a material fact, (2) intent to deceive or a state of mind so reckless respecting consequences as to be the equivalent of intent (scienter), (3) justifiable reliance on the misrepresentation by the party deceived, inducing him to act thereon, and (4) injury to the party deceived, resulting from reliance on the misrepresentation. Norton v. Curtiss, 433 F.2d 779, 793, 167 USPQ 532, 543 (CCPA 1970).[5]
 
 
 24
 Conduct before the PTO that may render a patent unenforceable is broader than "common law fraud". Norton v. Curtiss, 433 F.2d at 793, 167 USPQ at 543-44. It includes failure to disclose material information, or submission of false material information, with an intent to mislead. Because the "fraud" label can be confused with other forms of conduct, this opinion avoids that label and uses "inequitable conduct" as a more accurate description of the proscribed activity, it being understood that the term encompasses affirmative acts of commission, e.g., submission of false information, as well as omission, e.g., failure to disclose material information.
 
 
 25
 "Inequitable conduct" requires proof by clear and convincing evidence of a threshold degree of materiality of the nondisclosed or false information. It has been indicated that the threshold can be established by any of four tests: (1) objective "but for"; (2) subjective "but for"; (3) "but it may have been"; and (4) PTO Rule 1.56(a), i.e., whether there is a substantial likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether to allow the application to issue as a patent. American Hoist, 725 F.2d at 1362, 220 USPQ at 772-73. The PTO standard is the appropriate starting point because it is the broadest and because it most closely aligns with how one ought to conduct business with the PTO. American Hoist, 725 F.2d at 1363, 220 USPQ at 773. It served as the focus of inquiry in Hycor Corp. v. The Schlueter Co., 740 F.2d 1529, 1539, 222 USPQ 553, 560 (Fed.Cir.1984), and in Driscoll v. Cebalo, 731 F.2d 878, 884, 221 USPQ 745, 750 (Fed.Cir.1984). Under the standard, a reference that would have been merely cumulative is not material. Kimberly-Clark Corp. v. Johnson & Johnson, 745 F.2d 1437 at 1455-1456 (Fed.Cir.1984).
 
 
 26
 "Inequitable conduct" also requires proof of a threshold intent. That intent need not be proven with direct evidence. Hycor, 740 F.2d at 1540, 222 USPQ at 561. It may be proven by showing acts the natural consequences of which are presumably intended by the actor. American Hoist, 725 F.2d at 1363, 220 USPQ at 773; Kansas Jack, Inc. v. Kuhn, 719 F.2d 1144, 1151, 219 USPQ 857, 862 (Fed.Cir.1983). Proof of deliberate scheming is not needed; gross negligence is sufficient. Hycor, 740 F.2d at 1540, 222 USPQ at 561. Gross negligence is present when the actor, judged as a reasonable person in his position, should have known of the materiality of a withheld reference. Driscoll v. Cebalo, 731 F.2d at 885, 221 USPQ at 751; Kansas Jack, Inc. v. Kuhn, 719 F.2d at 1152, 219 USPQ at 862. On the other hand, simple negligence, oversight, or an erroneous judgment made in good faith, is insufficient. Orthopedic Equip. Co. v. All Orthopedic Appliances, 707 F.2d 1376, 1383, 217 USPQ 1281, 1286 (Fed.Cir.1983).
 
 
 27
 Once the thresholds of materiality and intent are established, the court must balance them and determine as a matter of law whether the scales tilt to a conclusion that inequitable conduct occurred. American Hoist, 725 F.2d at 1364, 220 USPQ at 774. If the court reaches that conclusion, it must hold that the patent claims at issue are unenforceable.
 
 
 28
 Whether the holding should be one of invalidity or unenforceability has had no practical significance in cases thus far presented to this court and has not therefore been addressed. This court has accepted the terminology employed by the district court. Compare, Connell v. Sears, Roebuck & Co., 722 F.2d 1542, 220 USPQ 193 (Fed.Cir.1983) (upholding district court determination that the patent was not unenforceable for fraud)[6] with Rohm and Haas Co. v. Crystal Chemical Co., 722 F.2d 1556, 220 USPQ 289 (Fed.Cir.1983), cert. denied, --- U.S. ----, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984) (reversing determination that the patent was not invalid for fraud).
 
 
 29
 The Supreme Court has discussed inequitable conduct, as a defense to a claim of patent infringement, in terms of enforceability, see, e.g., Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814-16, 65 S.Ct. 993, 997-98, 89 L.Ed. 1381 (1945). In Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 176, 86 S.Ct. 347, 349, 15 L.Ed.2d 247 (1965), in addressing a claim for damages under Sec. 4 of the Clayton Act based, inter alia, on alleged willfully fraudulent procurement of a patent, the Court spoke of "invalidity". Some courts have extrapolated from Walker Process two categories of defenses: (1) "fraud", rendering the patent invalid and (2) "other inequitable conduct", rendering the patent unenforceable. See, e.g., Timely Products Corp. v. Arron, 523 F.2d 288, 297, 187 USPQ 257, 264 (2d Cir.1975); In re Multidistrict Litigation Involving Frost Patent, 398 F.Supp. 1353, 1367-68, 185 USPQ 729, 740 (D.Del.1975), aff'd in part, 540 F.2d 601, 191 USPQ 241 (3rd Cir.1976).[7]
 
 
 30
 Focusing on the effect of inequitable conduct as a defense, we conclude that it results in unenforceability. The Patent Act of 1952 states in 35 U.S.C. Sec. 282 the defenses to a patent infringement suit:
 
 
 31
 (1) Noninfringement, absence of liability for infringement, or unenforceability.
 
 
 32
 (2) Invalidity of the patent or any claim in suit "on any ground specified in part II of this title as a condition for patentability" [i.e., "novelty and loss of right" under Sec. 102 and "non-obvious subject matter" under Sec. 103].
 
 
 33
 (3) Invalidity under sections 112 or 251 of this title.
 
 
 34
 (4) Any fact or other act made a defense by this title.
 
 
 35
 Paragraph (1) includes "equitable defenses such as laches, estoppel and unclean hands". P.J. Federico, "Commentary On The New Act", 35 U.S.C.A. at 55. Because at the time the Patent Act was enacted Supreme Court cases had treated inequitable conduct as an "unclean hands" type defense, see, e.g., Precision Instrument, cf., Driscoll v. Cebalo, 731 F.2d at 884, 221 USPQ at 750-51, the defense fits best in the "unenforceability" phrase of paragraph (1). That approach accords, also, with the specification of particular bases for invalidity in paragraphs (2) and (3) in Sec. 282.
 
 
 36
 The CCPA decision in Norton v. Curtiss, 433 F.2d at 793, 167 USPQ at 543 supports the view that inequitable conduct results in unenforceability:
 
 
 37
 In suits for patent infringement, unenforceability, as well as noninfringement or invalidity under the patent laws, is a statutory defense. See 35 U.S.C. Sec. 282(1). We have noticed that unenforceability due to fraudulent procurement is a rather common defense. In such circumstances, we find that the courts are generally applying equitable principles in evaluating the charges of misconduct alleged to be fraudulent. Thus, in suits involving patents, today, the concept of "fraud" on the Patent Office (at least when a patentee's conduct pertaining to the relative merits of his invention is concerned) encompasses not only that which we have termed earlier "technical" [i.e., common law] fraud but also includes a wider range of "inequitable" conduct found to justify holding a patent unenforceable.
 
 
 38
 Accord, American Optical Corp. v. United States, 179 USPQ 682, 684 (Ct.Cl.Tr.Div.1973).
 
 
 39
 Once a court concludes that inequitable conduct occurred, all the claims--not just the particular claims to which the inequitable conduct is directly connected--are unenforceable. See generally, cases collected in 4 Chisum, PATENTS, p 19.03 at 19-85 n. 10 (1984). Inequitable conduct "goes to the patent right as a whole, independently of particular claims". In re Clark, 522 F.2d 623, 626, 187 USPQ 209, 212 (CCPA 1975). As stated in Gemveto Jewelry Co. v. Lambert Bros., Inc., 542 F.Supp. 933, 943, 216 USPQ 976, 984 (S.D.N.Y.1982):
 
 
 40
 The gravamen of the fraud defense is that the patentee has failed to discharge his duty of dealing with the examiner in a manner free from the taint of 'fraud or other inequitable conduct'. If such conduct is established in connection with the prosecution of a patent, the fact that the lack of candor did not directly affect all the claims in the patent has never been the governing principle. It is the inequitable conduct that generates the unenforceability of the patent and we cannot think of any cases where a patentee partially escaped the consequences of his wrongful acts by arguing that he only committed acts of omission or commission with respect to a limited number of claims. It is an all or nothing proposition. [Emphasis in original.[8]
 
 
 41
 If affected claims were considered invalid, rather than unenforceable, the entire patent would nonetheless be affected. Section 288 of Title 35 states:
 
 
 42
 Whenever, without deceptive intention, a claim of a patent is invalid, an action may be maintained for the infringement of a claim of the patent which may be valid. [Emphasis added.]
 
 
 43
 That provision was intended to eliminate the "common law rule that if a patent is invalid in part it is completely invalid". Federico, supra, 35 U.S.C.A. at 48. The "without deceptive intention" phrase in Sec. 288 reveals that the common law rule is not eliminated "when deception or fraud is involved". Id. See, Chromalloy American Corp. v. Alloy Surfaces Co., Inc., 339 F.Supp. 859, 875, 173 USPQ 295, 306 (D.Del.1972) ("Sec. 288 by its express terms rules out infringement actions to enforce a patent in which any one of its claims is invalid by reason of fraud or deception"). Accord, Kearney & Trecker Corp. v. Giddings & Lewis, Inc., 452 F.2d 579, 596, 171 USPQ 650, 664 (7th Cir.1971), cert. denied, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972); Reynolds Metals Co. v. Continental Group, Inc., 525 F.Supp. 950, 971, 210 USPQ 911, 929 (N.D.Ill.1981).
 
 
 44
 In this case, our analysis focuses on the process claims. We conclude that inequitable conduct occurred with respect to those claims and that the product claims in suit are therefore unenforceable.
 
 B. Standard of Review
 
 45
 Materiality and intent are factual issues subject to the clearly erroneous standard of review. See, e.g., Hycor, 740 F.2d at 1539-40, 222 USPQ at 557, American Hoist, 725 F.2d at 1361, 220 USPQ at 772. Thus, this court must affirm findings on materiality and intent unless it is left with a definite and firm conviction that error has occurred. See, e.g., Raytheon Co. v. Roper Corp., 724 F.2d 951, 956, 220 USPQ 592, 596 (Fed.Cir.1983), cert. denied, --- U.S. ----, 105 S.Ct. 127, 83 L.Ed.2d 69 (1984). If the threshold of materiality and intent is crossed, we must determine, as a matter of law, whether inequitable conduct occurred. American Hoist, 725 F.2d at 1364, 220 USPQ at 774.
 
 C. Materiality of Weiss and DaGasso
 
 46
 The district court, essentially ignoring the PTO reissue proceeding, found that "[t]he Weiss and DaGasso patents are either not as material as other art cited by the PTO or there is [sic] competent conflicting opinions by reasonable experts such that the failure to cite Weiss and DaGasso cannot constitute intentional deception or gross negligence." It found that the '912 invention differed from those of Weiss and DaGasso, and stated that "[t]his difference indicates that the inventions involved are significantly different, and the claim language that the patentees have been consistently relying on to distinguish their invention over Weiss and DaGasso has some genuine technological base."
 
 
 47
 Error resulted from a failure to give primary consideration to events involved in the PTO reissue proceeding. As stated above, the starting point for determining materiality is the PTO standard, i.e., a substantial likelihood that a reasonable examiner would have considered the nondisclosed information important in deciding whether to allow the application to issue as a patent. Consequently, the result of a PTO proceeding that assesses patentability in light of information not originally disclosed is of strong probative value in determining whether the nondisclosed information would have been material.
 
 
 48
 The rejections of the process claims in reliance on Weiss and DaGasso in the reissue proceeding indicate that those references were clearly important to the PTO in deciding that most of the process claims were unpatentable. Those references would have been equally important in the original prosecution of the '912 application. That importance, alone, establishes the materiality of those references--as long as the rejections were themselves reasonable. The latter condition, which is necessary to a finding under the PTO standard of materiality that a "reasonable examiner" would have considered the references important, is satisfied here. The process claims include the key step of subjecting a torque stretch yarn to a selected tension during heat treatment. That step is taught by Weiss and DaGasso, rendering them more material, or "important" under the PTO standard, than any of the references cited in the original prosecution or by the district court. It was clearly reasonable, therefore, for the examiner to make, and the Board for the most part to sustain, rejections of the process claims on Weiss and DaGasso.
 
 
 49
 The district court appears to have been persuaded by Lex Tex' argument that the process claimed in the '912 patent differed significantly from the processes of Weiss and DaGasso. Its process, says Lex Tex, involves "controlling" the tension by positively driven feed rolls whereby the tension can be increased or decreased. Though Weiss and DaGasso involve means to increase tension, says Lex Tex, they do not include feed rolls that can increase or decrease it, and the invention described in the '912 specification therefore differs from that described in the references. Lex Tex argues that claims are interpreted in light of the specification and that the "control" language of the claims must be therefore limited to means that can increase or decrease tension, i.e., positively driven feed rolls.
 
 
 50
 We disagree. Claims should be construed in light of the specification, see e.g., Fromson v. Advance Offset Plate, Inc., 720 F.2d 1565, 1569, 219 USPQ 1137, 1140 (Fed.Cir.1983), but that does not mean that claims incorporate all disclosures in the specification. Id. at 1570, 219 USPQ at 1141. Moreover, nothing in the '912 specification requires that the process claims be limited to control means that can either increase or decrease tension (such as positively driven feed rolls). The specification discloses six general embodiments of the process invention, two that involve reducing tension and four that involve increasing tension after the torque stretch yarn is produced. The "controlling" limitation of the process claims reads on selecting a tension and applying heat--whether the tension be high or low. It does not require, whether or not it is read in light of the specification, that the controlling means be capable of selectively accomplishing either an increase or decrease in tension. Indeed, the specification describes an option without feed rolls for simultaneous application of heat and tension.
 
 
 51
 The district court, in finding Weiss less relevant than Billion, noted the continuous nature of the '912 process in comparison with Weiss' batch process. That Weiss involved a batch process does not require, however, a finding that Weiss was not material, or that it was less material than Billion. The difference between continuous and batch processes is merely one difference to consider in determining whether the claimed invention would have been nonobvious. That difference does not undermine the importance of Weiss' teaching of a simultaneous heat-tension treatment, an important aspect of the claims.
 
 
 52
 The district court also noted there was evidence that Finlayson, together with Chavanoz, made a better reference than Weiss or DaGasso, and that Chavanoz is a better reference than DaGasso. Noting the existence of such evidence does not provide a finding subject to review. Moreover, Finlayson does not teach the key step of simultaneous tension and heat taught by Weiss, and Chavanoz refers to "minimum" tension and in a sense teaches away from the '912 invention.[9]
 
 
 53
 The district court also noted the possibilities that the primary examiner of the '912 patent: (1) knew of Weiss because he was also the primary examiner of the United States counterpart to Weiss and conducted prior art searches in classes that included Weiss; and (2) knew of DaGasso because he was also the primary examiner of the '724 application, in which DaGasso was cited. If the primary examiner actually knew about the Weiss and DaGasso references when examining the '912 application, that knowledge might preclude a finding of materiality. Cf., Environmental Designs v. Union Oil Co. of Calif., 713 F.2d 693, 698, 218 USPQ 865, 870 (Fed.Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984) (failure to submit a page from textbook not fraud because it was already known and of record before examiner); Orthopedic Equipment Co. v. All Orthopedic Appliances, 707 F.2d 1376, 1383, 217 USPQ 1281, 1286 (Fed.Cir.1983) (nondisclosure not material because the examiner independently ascertained the existence of the undisclosed prior art). However, the district court did not find actual knowledge by the primary examiner--it merely noted possibilities and, where inequitable conduct is at issue, mere possibilities are insufficient. As stated in Driscoll v. Cebalo, 731 F.2d at 885, 221 USPQ at 751: "It cannot be presumed, where fraud or other egregious conduct is alleged, that the PTO considered prior art of particular relevance if it was not cited". There is no evidence, and Lex Tex does not argue on appeal, that the primary examiner actually recalled the critical aspects of the U.S. Weiss or DaGasso patents. Nor is there evidence that the examiner principally responsible for examining the application, as opposed to the primary examiner, had knowledge of the references.[10]
 
 D. Intent
 
 54
 The district court found "no clear and convincing evidence that the applicants or their attorney, believing Weiss to be relevant, intentionally withheld it from the PTO or that they acted with recklessness or gross negligence", and it found "no evidence of deceptive intent with respect to the failure to cite DaGasso in the original application". In the latter regard, said the district court, "[t]he evidence does show ... that [applicants] believed that the claim limitations in the '912 were clearly and patentably distinguished from DaGasso".
 
 
 55
 Those findings must be determined to have been clearly erroneous. As stated above, threshold intent is established where an actor in an applicant's position would have reasonably known that the reference was material, e.g., that the reference would have been important to a reasonable examiner in deciding whether to allow the claims. Here, where none of the prior art cited during prosecution taught a key element of the claimed process invention, and where both Weiss and DaGasso taught that key element, the applicants for the '912 patent should have known that those references would be important to the PTO, especially in light of certain undisputed facts: (1) claim 4 of the '724 application was rejected on DaGasso; (2) licenses were taken under Weiss and foreign counterparts to Weiss; and (3) corresponding foreign applications were rejected on Weiss.
 
 
 56
 1. Rejection of claim 4 of the '724 application
 
 
 57
 Original claim 4 of the '724 application and claim 30 of the '912 patent are similar. Each require treatment of torque stretch yarn with simultaneous heat and tension. Claim 4 reads (the underlined matter was added and the bracketed matter deleted by amendment):
 
 
 58
 Apparatus for processing textile yarns comprising means for continuously advancing said yarn from a source of supply, means for continuously collecting said advancing yarn, means to heat and false twist said advancing yarn in one portion of its continuous travel, adjustable means to apply tension to the advancing yarn in said one portion of its travel, and means to regulate the heater means in correlation with the applied tension to produce "torque stretch yarn", [and] means intermediate said second and third mentioned means to uniformly heat said continuously advancing "torque stretch yarn" at a [controlled] selected tension in a subsequent portion of its continuous travel, and adjusting means for regulating both the last-mentioned heating means and the selected tension to control the heat and tension in accordance with the characteristics of the yarn.
 
 
 59
 Issued claim 30 of the '912 patent reads (the underlined matter was added by amendment):
 
 
 60
 A method of processing yarn comprising the steps of unwinding said yarn from a supply package, continuously processing said yarn to form 'torque stretch yarn', thereafter continuously passing said yarn through at least one tensioning apparatus, continuously heating said yarn while under the control of said tensioning apparatus, then continuously passing said torque stretch yarn through a second tensioning apparatus, and continuously winding said processed yarn into a take-up package.
 
 
 61
 Claim 4 of the '724 application (in partially amended form) was rejected on October 13, 1959, on DaGasso in view of U.S. Patent No. 3,869,312 to Van Dijk. Concerning the rejection, applicant Seem stated in internal correspondence that DaGasso "does disclose our can-can [double heater] type of apparatus to continuously produce and post treat torque stretch yarn". Though applicants further amended the claim in an effort to avoid the prior art, the claim was again rejected, on November 7, 1960, on the same references. The claim was then cancelled in favor of a new claim 5, which was subsequently amended and issued.
 
 
 62
 Fully aware of DaGasso and its materiality in relation to the application that resulted in the '724 patent, applicants should have known of its materiality in relation to the '912 application. Applicants nonetheless elected not to disclose DaGasso to the examiner of the latter application.
 
 
 63
 Indeed, applicants argued that claims 35 and 36 of the '912 application were patentable over a single heater patent of their own because the '912 invention contemplates the additional step of heating and tensioning false twist yarn. That argument implies that the prior art does not teach a heating/tensioning step, yet applicants knew that DaGasso did teach that very step. Applicants also urged, in attempting to distinguish a rejection on Finlayson in view of Chavanoz, that those patents do not teach the application of heat and two degrees of tension. But applicants knew that that teaching is also present in DaGasso.
 
 2. Licensing the British Weiss patent
 
 64
 In March, 1957, Universal Winding Company, later Leesona Corporation (Universal), the then owner of the '912 application, introduced a machine for reprocessing torque stretch yarn. Heberlein, the owner of the Weiss patent, informed Universal that sale of the machine would be a contributory infringement of the Weiss process claims. Universal took a license under foreign counterparts to the Weiss patent. Fluflon, Ltd., a British company owned in part by Stoddard and Seem, also took a license under Weiss.
 
 
 65
 The district court discounted the effect of the Universal license, viewing it as merely an "economic decision based upon a desire to avoid costly litigation over the Weiss patent since it might be considered a dominating patent under the patent laws in Europe". There is no evidence, stated the district court, that such "business judgment" amounted to gross negligence or recklessness.
 
 
 66
 We agree that taking a license may have been an exercise in good business judgment. We find the consideration irrelevant, however, to a determination of whether the failure to disclose the licensed patent, Weiss, to the PTO during prosecution of the '912 application, was grossly negligent or otherwise "intentional".
 
 
 67
 The license agreements are virtually conclusive evidence that the applicants should have known of the materiality of Weiss. Applicants may have believed that the '912 process was patentable over Weiss, but that they took a license under it in connection with the sale of their machine that performed the '912 process evinces knowledge of Weiss' importance. A failure to disclose Weiss in view of that knowledge constitutes reckless disregard of the duty to disclose.
 
 
 68
 3. Rejections On Weiss Of Foreign Corresponding Applications
 
 
 69
 Japanese, German and British applications corresponding to the '912 application were filed during pendency of the latter. The Japanese and German applications were rejected in view of Weiss, and the Japanese application was eventually abandoned. The British counterpart was allowed despite the citation of Weiss.
 
 
 70
 The district court stated that "while the applicants were aware of the Weiss patent, there was no recognition on their part of its materiality or relevance [in the United States] because of the differences in the patent laws of these foreign countries as to disclosure, claims practice, forms of applications and standards of patentability".
 
 
 71
 Differences in foreign patent laws may in other contexts be important. They are not relevant in determining intent underlying a failure to disclose to the PTO. The controlling factor in that determination is found in the nondisclosed information itself. Whether the '912 applicants can be viewed as meeting the threshold of intent to mislead the PTO has nothing to do with rules governing disclosure, claims, applications and patentability in foreign lands. Whether Weiss should have been disclosed under those rules in those lands has no controlling effect on whether it should have been disclosed to the PTO here. That Weiss was cited and claims were rejected on Weiss in applications corresponding to the '912 application should have caused a reasonable applicant to have so recognized its materiality in the PTO as to have led to its disclosure. No requirement exists to disclose to the PTO all references cited against foreign corresponding applications; yet in the present circumstances the failure to cite Weiss in light of its citation in foreign lands is strong evidence of intent to mislead.
 
 4. Lex Tex' Argument Re Intent
 
 72
 Citation of DaGasso in the prosecution of the '724 application, licensing under Weiss, and citation of Weiss in rejection of foreign counterparts of the '912 application, evince a degree of awareness of the importance (materiality) of the references sufficient to compel a conclusion that the district court's no-intent finding was clearly erroneous.
 
 
 73
 Lex Tex argues that if its narrow interpretation of the claimed "control" means was incorrect, the '912 applicants possessed a good faith belief in that interpretation, and because that interpretation renders Weiss and DaGasso immaterial there can be no finding of the necessary intent.
 
 
 74
 There is no evidence, however, that the '912 applicants actually possessed a good faith belief in the argued claim interpretation. Testimony of the applicants would have been helpful on that issue, but applicants passed away before trial without relevant depositions having been taken.
 
 
 75
 Moreover, applicants should have known that, during prosecution, claims are given their broadest reasonable interpretation in light of the specification. In re Yamamoto, 740 F.2d 1569, 1571, 222 USPQ 934, 936 (Fed.Cir.1984); In re Sneed, 710 F.2d 1544, 1548, 218 USPQ 385, 388 (Fed.Cir.1983); In re Marosi, 710 F.2d 799, 802, 218 USPQ 289, 292 (Fed.Cir.1983); In re Heck, 699 F.2d 1331, 1332, 216 USPQ 1038, 1039 (Fed.Cir.1983); In re Prater and Wei, 415 F.2d 1393, 1404-05, 162 USPQ 541, 550-51 (CCPA 1969); In re Kebrich, 201 F.2d 951, 954, 96 USPQ 411, 414 (CCPA 1953); Ex parte De Grunigan, 132 USPQ 152, 156 (PTO Bd.App.1958). Hence, applicants' narrow claim interpretation, if it existed, would have been unreasonable.
 
 
 76
 In all events, prosecution of the '724 application indicates that the '912 applicants did not possess the now-asserted belief in a narrow claim interpretation. Claim 5 of the '724 application, and claims dependent thereon, were allowed only after they were amended to change the "tension controlling means" to "tension controlling means including positively driven feed rolls between said heating device and said false-twist device". Applicants argued:
 
 
 77
 It is submitted that claim 5 is patentable over the Italian patent [DaGasso]. The claim clearly defines the tension-controlling means as including positively-driven feed rolls between the heater and the false-twister whereby the second tensioning means is adjustable independently of said first-mentioned means.
 
 
 78
 By that amendment, applicants conceded that "tension controlling means" does not impliedly include "positively driven feed rolls".
 
 
 79
 Further, a good faith belief that claims should be narrowly construed to avoid uncited prior art will not necessarily or always preclude a finding of recklessness or gross negligence in failing to cite that art. The references may be important in assessing patentability, whatever may be the applicant's view. In Driscoll v. Cebalo, 731 F.2d 878, 221 USPQ 745 (Fed.Cir.1984), applicant cancelled a claim he believed was anticipated by a Canadian reference, replacing it with a claim that he believed avoided that reference. This court refused to give controlling effect to applicant's subjective determination that the new claim avoided the art. A finding of intent was reached in Driscoll, notwithstanding contemporaneous evidence that the applicant there did believe the new claim avoided the art. Here, where there is no evidence of good faith belief in the narrow claim interpretation, and there is contrary evidence, a finding is compelled that the intent element of inequitable conduct is clearly present.
 
 5. Balancing Materiality and Intent
 
 80
 A high degree of materiality was present here. The PTO standard was easily met by the close relationship of the Weiss and DaGasso disclosures to the claims of the '912 patent, as reflected in the citation of Weiss and DaGasso by the reissue examiner.
 
 
 81
 There was also a relatively high degree of intent. If there were no deliberate scheming, there was clearly reckless or grossly negligent activity. Applicants clearly should have known of the materiality of Weiss and DaGasso, especially after they took licenses under Weiss and its counterparts, had their foreign applications rejected on Weiss, and had similar claims in their virtually identical CIP application rejected on DaGasso.
 
 
 82
 Balancing materiality and intent, we are compelled to conclude that "inequitable conduct" occurred. Accordingly, all claims of the patent must be held unenforceable.
 
 CONCLUSION
 
 83
 That portion of the final judgment holding the claims in suit not unenforceable is reversed. The remaining portions of the judgment are vacated as now moot.
 
 REVERSED-IN-PART; VACATED-IN-PART
 
 
 [1]
 The district court also rejected a defense of fraud based on failure to disclose an agreement settling an interference between the owner of a Baebler application and the '912 applicants. Because of our disposition we need not and do not address the rejection of that defense
 
 
 [2]
 The order was issued during the period of the "Dann Amendments" (March 1977 through May 1982) during which patentees could seek "no-defect" reissues, and have their claims considered in light of new prior art without amending the claims or specification and without including in the reissue oath a statement of belief, otherwise required by 35 U.S.C. Sec. 251, that the original patent was "wholly or partly inoperative or invalid". Though the reissue application would be rejected for failure to comply with Sec. 251, the record of prosecution would indicate the PTO's evaluation of the prior art and thereby assist a district court
 
 
 [3]
 Burlington says "events prevented" its submission of the fraud issue during the reissue proceeding. The Assistant Commissioner ordered the issue set aside until after disposition of the patentability issue and trial was resumed before the PTO reached the fraud issue
 
 
 [4]
 In view of our disposition, we need not and do not address the patent validity or purge of misuse issues
 
 
 [5]
 In American Hoist & Derrick Co. v. Sowa & Sons, 725 F.2d 1350, 1367, 220 USPQ 763, 776 (Fed.Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984), this court stated that Norton erroneously referred to "technical" instead of common law fraud, and vowed not to use "technical"
 
 
 [6]
 Connell added, in footnote 7, that, fraud on the PTO "may result" in a holding of nonenforceability equivalent to invalidity. In Connell, the inequitable conduct--if it had been proven--would have been "conduct incurable with respect to the claims as presently drawn"
 
 
 [7]
 Our discussion of the criteria for unenforceability does not encompass the test for a Walker Process type of claim
 In Timely Products, it was said that claims can be unenforceable due to "unclean hands" without satisfaction of the materiality requirement, and that claims can be invalidated due to fraud when the materiality requirement is satisfied. That categorization is inconsistent with this court's view that materiality is a necessary ingredient of any inequitable conduct.
 
 
 [8]
 In In re Multidistrict Litigation Involving Frost Patent, 540 F.2d 601, 611, 191 USPQ 241, 249 (3rd Cir.1976), some claims were upheld despite nondisclosure with respect to others. That case is not precedent in this court
 
 
 [9]
 During the reissue proceeding, the Chavanoz reference was eliminated by a PTO Rule 131 affidavit
 
 
 [10]
 Nor did appellee show that the examiner primarily responsible for examining '912 was primarily responsible for examining the U.S. Weiss and '724 applications. Compare, Kimberly-Clark Corp. v. Johnson and Johnson, 745 F.2d 1437 at 1455-1457 (Fed.Cir.1984), where the court concluded "no fraud" because, inter alia, the examiner of the application had been the examiner of the reference. That, however, was only one of many facts enabling the court to find that the examiner actually knew about the copending reference, that the applicant knew the examiner knew about the reference and, hence, that there was no materiality or intent. Under the facts of this case, we can make no similar determination