**ADVANCED CARDIOVASCULAR SYSTEMS, INC., Plaintiff,**

v.

**SCIMED LIFE SYSTEMS, INC., Defendant.**

**No. 3–87 CIV 580.**

United States District Court,
D. Minnesota,
Third Division.

Sept. 29, 1988.

---

Fulwider, Patton, Rieber, Lee & Utecht by Richard A. Bardin and Craig Bailey, Los Angeles, Cal., and Oppenheimer, Wolff & Donnelly by Leon R. Goodrich, St. Paul, Minn., for plaintiff.

Fish & Neave by Robert C. Morgan, New York City, and Popham, Haik, Schnobrich & Kaufman, Ltd. by Wayne G. Popham, Minneapolis, Minn., for defendant.

## ORDER

ALSOP, Chief Judge.

## I. INTRODUCTION.

The above entitled matter came on for hearing before the court on September 9, 1988, upon the motion of defendant Scimed Life Systems, Inc. ("Scimed"), for summary judgment on the issues of non-infringement and inequitable procurement.

This case involves two manufacturers of coronary catheters. Advanced Cardiovascular Systems, Inc. ("ACS") alleges in its complaint that Scimed has created a catheter which infringes on its Simpson-Robert catheter, patent number 4,323,071 ("'071"). The part of the catheters at issue is the end of the catheter that is actually inserted into the artery of a patient (the "distal end"). In actual use, the distal end of the catheter is guided through a patient's artery to the area of a coronary artery that is narrowed by deposits. Both catheters have a balloon at the distal end of the catheter, which is "blown up" after it reaches the area of the narrowing. As the balloon expands, it presses against the deposits and walls of the artery, enlarging the artery and facilitating the passage of blood through that area. The controversy relates to the tube and balloon assembly at the distal end of the catheter. In the '071 catheter, the balloon is formed out of the outer tube of the catheter itself. In the Scimed catheter, the balloon is a separate piece that is glued onto the outer tube to complete the assembly. ACS has charged that Scimed's assembly infringes on its '071 patent. Scimed has brought a motion for summary judgment in its favor on two grounds. First, that as a matter of law its catheter does not infringe patent '071; secondly,

that the '071 patent is unenforceable because it was inequitably procured. Both issues will be discussed in turn.

## II. NON-INFRINGEMENT.

### A. *Background.*

In its complaint, ACS charged that the Scimed catheter infringed Claims 1 and 5 and 10–16 of its '071 patent. Scimed disputes these allegations, asserting that its catheter does not fall within the claims of the '071 patent. In particular, Scimed seizes upon specific language found in Claims 1, 5, 10, and 11 to distinguish its catheter from ACS's. Claims 1, 5, and 10 each specify that in the ACS catheter the balloon must be "formed integral" with the catheter tube. Claim 11 in a similar manner refers to the outer tube and states that the balloon is "formed therein." ACS contends that "formed integral" means that the balloon "continues and completes the structure with comparable material properties." Scimed, on the other hand, claims that "formed integral" means "of one piece" or unglued.

A brief history of the prosecution of the '071 patent is necessary to understand the "formed integral" language of the patent. In early 1978, Doctors Simpson and Robert were performing studies which used dilation catheters. The primary instruments they used at that time were Gruntzig catheters, which consisted of an inner tube, an outer tube, and a balloon glued onto the outer tube. Simpson and Robert felt these catheters were less than ideal in that they were expensive, difficult to obtain, and had a high rate of failure at the epoxy seals which attached the balloon to the tube. The doctors set out to, and did, invent a catheter which better suited their needs. The new Simpson-Robert device still consisted of an inner and outer tube. It differed from Gruntzig, however, in the fact that the balloon was not glued onto the outer tube, but was formed out of the tube itself. This feat was accomplished by heating a short segment of the outer tube, expanding that segment, and then sealing the ends of the tubes by heating

and shrinking one tube onto the other. This provided a fluid tight adhesive-free seal. This single piece construction made the devices simpler to make and less expensive than the early catheters.

The doctors then attempted to obtain a patent for their catheter. To that end, they engaged Mr. Harold Hohbach and the firm of Flehr, Hohbach, Test, Albritton, & Herbert, to assist them. The first application for the Simpson–Robert patent was filed on April 24, 1978. In that first application, Claim 1 stated that the catheter consisted of a "tubular member having proximal and distal ends and [an] inflatable balloon-like portion formed integral with the tubular member near the distal end thereof." Claims 9 and 10 (which ultimately became Claims 10 and 11 of the final patent) did not mention the word "integral" but stated the balloon was formed "adjacent" to the distal end of the tube.

The patent Examiner rejected these claims, citing several other patents as prior art. ACS responded to the Examiner and sought to distinguish its catheter as follows: "In Nozick ... the balloon is a *separate part.* Applicant, on the other hand, has provided a balloon-shaped portion which is *formed from the same tubular member....*" (emphasis added). ACS also argued that its catheter assembly was not suggested by the previous patents, again stating that, "In applicant's novel construction, the balloon shaped portion is formed of the same tubular member which forms the tubular member of the catheter assembly."

After this explanation, the Examiner allowed Claim 1 and Claim 10 (which stated that the balloon was "formed therein" the outer tube). However, the Examiner continued to reject Claim 9, which lacked any "formed integral" or "therein" language.

ACS then filed a second application which contained many of the same claims as the first application. Again the Examiner rejected the application, and again ACS attempted to distinguish its catheter from the other catheters cited as prior art, particularly from the Gruntzig patent. In its

attempts to distinguish Gruntzig, ACS made the following comments:

[In Gruntzig] the collars 15 and 15' [the edges of the balloon] are secured by means of circumferentially extending *adhesive bonds* 22 to the carrier hose 11 [tube]. This is a very different construction from that which is disclosed and claimed by applicants.

ACS also said that:

Claim 1 calls for an inflatable balloon like portion *formed integral* with the tubular member near the distal end thereof. Such an integral construction *is not disclosed or even remotely suggested by Gruntzig* et al. Such an inflatable balloon like portion formed integral with the tubular member is an important feature of applicants' invention. It is therefore respectfully submitted that Claim 1 clearly defines invention over Gruntzig et al.

Finally, ACS stated that:

Claim 10 calls for first and second tubular members and specifies that the second tubular member has a *balloon shaped portion formed therein* adjacent to distal end. Again, such a construction is not disclosed by Gruntzig et al. *In Gruntzig et al. the balloon is a separate element cemented onto the hose 11.* This is certainly an inferior type of construction to applicants' integral construction.

(emphasis added in all cases.)

This time the applicant's arguments succeeded and the Examiner allowed proposed Claims 1 and 10. Nevertheless, ACS withdrew its second application and filed a third application which contained additional information about its catheter.

The third application, for purposes of this suit, contained the same claims as the second application. However, a new Claim 10 was added, which talked about the inflatable balloon being "formed adjacent the distal end" and omitting the "formed integral" language. Surprisingly, the Examiner rejected all Claims 1–10 of this third application. In response to this rejection, ACS requested and was granted a personal interview with the Examiner. After that

interview, ACS sent another response to the Examiner wherein ACS noted that "[a]s discussed during the interview, applicant has amended the claims on the present application so that they correspond to claims which have been allowed in the earlier filed application ...." At that time ACS also amended proposed Claim 10 to include the "formed integral" language which appears in the final version.

After the oral interview and changes, the Examiner allowed these claims and issued Patent '071.

In addition to the correspondence of the patent office and amendments, the specifications of the '071 patent also help in understanding how the ACS catheter is distinguished from Gruntzig. The specifications state that objects of the new invention include:

Providing a "catheter assembly and methods for making same so that they have the desired characteristics and so that they can be made uniformly and without undue expense;"

&ast; &ast; &ast; &ast; &ast; &ast;

Providing an assembly "in which an inflatable or distensible balloon like portion is formed integral with one of the tubular members forming the dilating catheter assembly;"

&ast; &ast; &ast; &ast; &ast; &ast;

Providing a dilating catheter "in which the balloon like portion can be readily and reliably formed;"

&ast; &ast; &ast; &ast; &ast; &ast;

Providing an assembly "in which the inner and outer coaxial tubular members are provided and in which a distal pressure seal is formed between the inner and outer tubular members solely by heating the outer heat shrinkable tubular member."

The specifications also describe one method by which these objectives could be met. In explaining how the balloon portion is formed from the tube itself, the specifications state:

The balloon like portion 43 is formed by expanding that portion of the tubing 38 [outer tube] surrounding the space 49 to

its elastic limit which generally corresponds to a ratio of 4 or 5 to 1 from the original extruded irradiated tubing size prior to the initial expansion.

Finally, the specifications also describe a method of joining the inner and outer tubes. They state that the segment of the outer tube extending past the balloon segment is to be heated to a suitable temperature so that it shrinks and adheres to the inner tube in such a way as to "provide a fluid tight, adhesive-free seal between the first and second tubular members ...."

### B. *Legal Standard.*

■ Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is also appropriate in patent cases. *Barmag Barmer Maschinenfabrik AG v. Murata Mach, Ltd.*, 731 F.2d 831 (Fed.Cir.1984). However, a motion for summary judgment on non-infringement should be approached with care, *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1573 (Fed.Cir.1985), and the evidence should be examined in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. The interpretation of patent claims is, however, a matter of law, and a dispute as to the legal effect of those claims does not preclude summary judgment. *George v. Honda Motor Co.*, 802 F.2d 432, 434 (Fed.Cir.1986).

■ The test for whether there is a genuine issue over a material fact is two-fold. First, the materiality of a fact is determined from the substantive law governing the claim. Only disputes over facts that might affect the outcome of the suit are relevant on summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Second, any dispute over material fact must be "genuine." A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id.* It is the non-moving

party's burden to demonstrate that there is evidence to support each essential element of its claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 81 L.Ed. 2d 265 (1986).

 ACS has charged that Scimed infringed its patent. Literal infringement exists if an accused device falls within the language of the asserted claims of a patent as properly interpreted. *Palumbo v. Don-Joy Co.,* 762 F.2d 969, 973 (Fed.Cir.1985). If the language of the claims is not disputed, the court's first step is to construe that language. In construing the language, the court should consider the claims themselves, the specifications, and the prosecution history of the patent. *Schriber–Schroth Co. v. Cleveland Trust Co.,* 311 U.S. 211, 217, 312 U.S. 654, 61 S.Ct. 235, 238, 85 L.Ed. 132 (1940); *Mannesmann Demag Corp. v. Engineered Metal Products,* 793 F.2d 1279, 1282 (Fed.Cir. 1986). If after such construction, the allegedly infringing device does not fall within the scope of the claims, there is no literal infringement.

 Even if there is no literal infringement, there can still be infringement under the doctrine of equivalents. *Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d 861, 869 (Fed. Cir.1985). The doctrine of equivalents protects the "essence" of a claim in that a device will be found infringing, even if it is not literally so, if it accomplishes the same work, in substantially the same way, and obtains substantially the same results. *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). However, "file wrapper" or "prosecution history" estoppel prohibits a patentee from using the doctrine of equivalents if the patentee gave up those claims or interpretations during the prosecution of the patent. *Graham v. John Deere Co.,* 383 U.S. 1, 33–34, 86 S.Ct. 684, 701–702, 15 L.Ed.2d 545 (1966); *Autogiro Co. v. United States,* 384 F.2d 391, 399, 181 Ct.Cl. 55 (1967). In effect, the prosecution history of the patent helps define the scope of the claims. If the patentee argued a narrow scope before the Patent and Trademark Office, that pat-

entee is precluded from arguing a broad construction of its claims in actions for infringement. *Coleco Indus. v. United States Int'l,* 573 F.2d 1247, 1257 (C.C.P.A. 1978).

## C. *Discussion.*

 Both parties agree that the interpretation given to the "formed integral" and "formed therein" language contained in Claims 1, 5, 10, and 11 is determinative of the outcome of this motion. There is no dispute as to the language of the claims or as to what constitutes the prosecution history of this patent, therefore, the interpretation of these claims is a matter of law. The interpretation urged by ACS is that "formed integral" denotes the fact that the balloon continues and completes the structure with comparable material properties. In the abstract, this is a possible interpretation, because in the Gruntzig catheter sought to be distinguished, the balloon is an "added" feature to the outer tube. However, the court cannot just look at these words in the abstract. As the following discussion shows, the prosecution history of the patent shows that these words meant to distinguish the Simpson–Robert catheter on the basis of its unitary and adhesive free construction. That is the definition the prosecution history has carved out for the words and that meaning must be used in an action for infringement.

There are several instances in the prosecution history of '071 where ACS, in distinguishing its catheter, emphasizes the fact that its catheter consists of one piece only. In its first response, ACS stated that in its catheter, the balloon was not a separate part, but was formed from the same tubular member and formed *of* that member. Such explanations point very strongly to a one piece/two piece distinction. Claim 10 of that application which talked about the outer tube, contained language that the balloon was "formed therein." This language survived the application process and is contained in Claim 11 of the actual patent. "Formed therein" carries the implicit suggestion that there is one piece with some permutation or difference occurring

*in* that piece. "Formed therein" does not lend itself well to the ACS's definition of "completing the structure." It does make sense in referring to a one piece major structure containing some sort of special segment.

In its response to its second application, ACS again distinguishes its catheter on the basis of its being one piece and not requiring two pieces which need be glued together. ACS stated that as opposed to Gruntzig, the balloon was not secured by adhesive bonds. It also said the balloon was "formed therein" the outer tube and was not a separate element which needed to be cemented onto the tube. Again, these comments show that what ACS relied on for its distinctiveness was the fact that in its catheter, the balloon was not a separate element from the tube and did not require adhesives to join the two parts.

The third application for the patent was successful, but its claims were allowed only after an oral interview. Although no representations made at that time clear up the meaning of "integral," ACS did acknowledge that it amended its claims to correspond to the claims earlier allowed. Any restrictions on the scope of the previous claims therefore also apply to the allowed claims.

Finally, in addition to the application correspondence, the specifications of the patent all point to an interpretation of integral as meaning "one piece." One of the goals of the patentees of the ACS catheter was to provide a way to make these catheters uniformly and inexpensively. This was in response to the then current method of having to hand glue the balloon onto a separate tube, which was very expensive. The method referred to in the specifications speaks of forming the balloon out of one of the tubes itself, not as having a balloon on the end of the catheter which completed the structure. The specifications also refer to the seals being formed from heating and shrinking the tubes together, thereby avoiding the need for gluing the assembly as in other catheters.

As is obvious from this lawsuit, "formed integral" and "formed therein" are never explicitly defined in the patent claims themselves. However, the prosecution history of the patent makes clear the definition by stating how this catheter differs from other catheters at the time. The tube-balloon assembly is different in that it is formed by making the balloon from the tube itself. It is *not* formed by gluing the balloon to the outer tube, and it is not made of two separate pieces. These distinctions supply the definition of integral. Defined in this manner, a catheter assembly such as Scimed's made of a balloon and tube which are separate pieces does not infringe on the claims of the '071 catheter.

It is significant to note that nowhere in the prosecution history of the patent does the definition that ACS urges appear. In its numerous attempts and opportunities to correspond with the Patent Examiner, ACS *never* refers to integral as meaning "completing and continuing the structure." Although such a construction is logically possible and ACS might be able to call experts who would testify in support of such an interpretation, it is not the meaning used in the file wrapper. The file wrapper uses a much more circumscribed definition, one which refers to the unitary construction of the catheter. ACS is now estopped by that history to urge a broader definition. Summary judgment will, therefore, be granted to Scimed on the grounds that its catheter does not infringe on the claims of the '071 patent.

## III. INEQUITABLE PROCUREMENT.

### A. *Background.*

Scimed's second motion requests that ACS's patent be declared unenforceable because it was inequitably procured. As proof of this inequitable conduct, Scimed points to the following facts.

ACS first applied for a patent for its catheter in the United States on April 24, 1978. As noted above, three applications for this patent were filed, and the patent finally issued on April 6, 1982. At the same time ACS was trying to obtain a United States patent for the Simpson–Robert catheter, it was also trying to obtain a

German patent for that catheter. The German application was filed on April 20, 1979, and the claims made in that application were substantially the same as contained in the United States application. On February 27, 1980, the German patent Examiner rejected the ACS application, citing as prior art a patent by Antoshkiw. After the date of this rejection, Mr. Hohbach, on behalf of ACS, filed several correspondences with the patent office and had an oral interview with the Examiner, all with regard to receiving a United States patent for the Simpson–Robert catheter. In none of these correspondences did Mr. Hohbach tell the Examiner about the existence of the Antoshkiw patent. Scimed now charges that this failure to disclose constituted inequitable conduct in that it was an intentional withholding of material art, and therefore, ACS's '071 patent is invalid.

### B. *Legal Standard.*

 Every patent applicant has an obligation to deal candidly with the patent office because the office lacks the means to perform all investigatory work itself. *True Temper Corp. v. C.F. & I. Steel Corp.*, 601 F.2d 495, 501 (10th Cir.1979). Indeed, the applicant has "an absolute duty of full and complete disclosure of all matters reflecting adversely upon his patent." *Id.* If the applicant for a patent fails to make full disclosure of prior material art, he is guilty of inequitable conduct and the patent is unenforceable. *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1559 (Fed.Cir.1984).

 To prevail in its claim of inequitable conduct in this case, Scimed must prove by clear and convincing evidence a deceptive intent on the part of Doctors Simpson and Robert, or their attorney, Mr. Hohbach, and that the prior art withheld from the patent office was material. *Akzo N.V. v. United States Int'l Trade Comm'n*, 808 F.2d 1471, 1481 (Fed.Cir. 1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987). The "intent to deceive" factor need not rise to the level of

a deliberate scheme. A finding of gross negligence in a failure to disclose material art may constitute the necessary intent. *J.P. Stevens*, 747 F.2d at 1566. However, a finding of deceptive intent is negated by showing the applicant did not know of the prior arts materiality or a showing that the applicant's failure to disclose the information was not the result of an intent to mislead the office. *F.M.C. Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed.Cir. 1987).

### C. *Discussion.*

 In its attempt to rebut Scimed's charge of inequitable conduct, ACS offered affidavits by Doctors Simpson and Robert and Mr. Hohbach. Mr. Hohbach states that he relied on the doctors for information regarding the materiality of prior art and the fact he did not disclose the Antoshkiw patent leads him to believe that at that time he thought Antoshkiw was not material,[1] and that at no time did he intend to deceive the patent office.

In the same vein, neither Doctor Simpson nor Robert proffers any remembrance of reviewing the Antoshkiw patent during the examination procedure. However, both state that it was their practice to inform Mr. Hohbach of all material information and that it was never their intention to deceive the patent office.

Scimed urges this court to view the failure to disclose Antoshkiw, after having it pointed out by the German Examiner, as clear and convincing evidence of the materiality of Antoshkiw and at least gross negligence on the part of Mr. Hohbach. It argues, citing *F.M.C. Corp. v. Manitowoc*, that ACS's bare denial of bad intent is not sufficient to defeat a motion for summary judgment. However, the *F.M.C.* opinion was issued after a full six-week trial. After full trial, a bare denial may not be enough to escape a decision of inequitable conduct, especially as in this case where the plaintiff by its own assertion of the attorney-client privilege has failed to bring forth possibly exculpatory documents. But this is a motion for summary judgment.

---

1. Mr. Hohbach testified at a deposition and in his affidavit that he had no present recollection of considering the Antoshkiw patent. The mate-rials which would show his thoughts at that time may be protected under the attorney-client privilege and were not available for this motion.

Summary judgment will be granted only where there are no genuine issues of material fact. Fed.R.Civ.P. 56. The declarations and affidavits of Simpson, Robert and Hohbach raise issues of fact as to their intent. This court does not weigh the credibility of such factual disputes at this stage. For this reason summary judgment regarding the materiality of the omissions and the intent of the parties is inappropriate.

The court finds, pursuant to Rule 54(b), that there is no just reason to delay the entry of judgment.

IT IS ORDERED That:

1. Defendant Scimed's motion for summary judgment on the grounds that its catheter does not infringe on ACS's patent number 4,323,071 be, and the same hereby is, GRANTED.

2. Defendant Scimed's motion for summary judgment on the grounds of inequitable procurement be, and the same hereby is, DENIED.

3. The Clerk shall enter judgment as follows:

### JUDGMENT

IT IS ORDERED, ADJUDGED AND DECREED That the complaint of Advanced Cardiovascular Systems, Inc., is dismissed.