**E.I. DUPONT DE NEMOURS &
CO., Plaintiff,**

v.

**MALLINCKRODT, INC., Defendant.**

No. C–1–84–355.

United States District Court,
S.D. Ohio, W.D.

Jan. 30, 1987.

**892**

Sewall P. Bronstein, George W. Neuner, Ronald Eisenstein, Boston, Mass., Albert E. Strasser, Cincinnati, Ohio, for plaintiff.

Donald G. Leavitt, St. Louis, Mo., J. Robert Chambers, Cincinnati, Ohio, for defendant.

## OPINION AND ORDER

HERMAN JACOB WEBER, District Judge.

This is an action by plaintiff E.I. DuPont De Nemours & Co. ("DuPont") against defendant Mallinckrodt, Inc. ("Mallinckrodt"), a wholly-owned subsidiary of Avon Products, Inc. ("Avon"), for infringement pursuant to 35 U.S.C. §§ 271 and 281–285 of three United States patents: U.S. Patent No. 4,082,840, U.S. Patent No. 4,016,249 and U.S. Patent No. 3,851,044, which are owned by DuPont.

Mallinckrodt has counterclaimed for a declaratory judgment that the patents in suit are invalid, void, unforceable and not infringed. Affirmative defenses raised by Mallinckrodt are that plaintiff is barred 1) by laches and estoppel from enforcing the patents in suit against defendant and 2) from enforcing the patents in suit against defendant because of inequitable conduct by plaintiff during prosecution of these patents before the United States Patent and Trademark Office (PTO).

As this case has been bifurcated, this Opinion and Order will deal only with the issue of liability. Jurisdiction of this Court pursuant to 28 U.S.C. § 1338 is not disputed. Venue is proper in this case pursuant to 28 U.S.C. § 1400.

## FINDINGS OF FACT

DuPont is a Delaware corporation having its principal place of business at Wilmington, Delaware. Plaintiff is the owner of U.S. Patent No. 4,082,840 (the "840" patent) which issued on April 4, 1978. Plaintiff is also the owner of U.S. Patent No. 4,016,249 (the "249" patent) which issued on April 5, 1977. Finally, plaintiff is the owner of U.S. Patent No. 3,851,044 (the "044" patent) which issued on November 26, 1974.

Plaintiff's predecessor in title of the patents in suit was New England Nuclear Corporation ("NEN"). On April 9, 1981, NEN was acquired by DuPont as a wholly-owned subsidiary. On June 29, 1984, NEN was merged into and is now a part of DuPont.

Defendant Mallinckrodt is a corporation duly organized and existing under the laws of the state of Missouri. Mallinckrodt is a wholly-owned subsidiary of Avon Products, Inc. Mallinckrodt was acquired by Avon on March 8, 1982.

This case involves radiology and nuclear medicine. Nuclear medicine is made up of two branches; the diagnostic branch and the therapeutic branch. This case involves the diagnostic branch which uses contrast agents for x-rays. In essence, one gets a picture from the radiation through the use of in vivo diagnostic agents.

Radioactive scanning is a method of diagnosis of a part of the body (target component) using radiographic images of such component produced by the uptake of a radioactive element (radionuclide) by the organ.

A pharmaceutical composition for intravenous injection must meet certain medical practice standards which include the requirements of sterility, non-pyrogenicity, non-toxicity and a minimal amount of inert particulate matter. Pyrogens are substances which may cause harmful reaction in the body. Sterility is determined by the growth of bacteria.

A composition for radioactive scanning is a pharmaceutical composition for intravenous injection. In addition to requiring sterility, non-pyrogenicity, non-toxicity and a minimal amount of inert particulates, it must provide a biological distribution of the radionuclide which will produce an acceptably clear image of the target component and a sufficiently low background image of other parts of the body to provide acceptable contrast.

Since at least 1965, it has been known that technetium–99m ($^{99m}$Tc) is a preferable radionuclide for radioactive scanning because it has many desirable characteristics. $^{99m}$Tc is readily obtainable as a sterile pertechnetate solution (eluant) from technetium–99m generators which are available in most hospitals having a nuclear medicine department. These generators became commercially available around 1965. $^{99m}$Tc has a short physical half-life of approximately six hours and a lack of beta emission, which means that $^{99m}$Tc can be administered relatively safely to humans allowing sufficient time for background activity to clear with the receipt of good pictures. In addition, the short half-life does not expose the person to radiation for substantially longer than necessary for use of diagnosis.

$^{99m}$Tc radiates gamma rays of a particular energy level which permits scanning of the body and which can be easily measured with a gamma camera.

The gamma emission of $^{99m}$Tc is suitable for imaging studies with either a gamma camera or a rectilinear.

Pertechnetate by itself is useful for imaging certain parts of the body such as the brain and the thyroid. To extend its usefulness to other parts of the body, the technetium must be reduced, e.g., by stannous.

A bone scanning for radioactive imaging of the bone is taken up by the skeletal

structure and shows areas of rapid and/or abnormal bone growth, e.g., tumors. Bone scanning is commonly used in detecting bone cancer. By 1970, there existed a long-standing unsatisfied need for a good radioactive bone scanning agent. The available radionuclides generally used for bone imaging before the present inventions were $^{85}$Sr (radioactive strontium) and $^{18}$F (radioactive fluorine). Both of these have relatively high gamma energies that render high resolution imaging difficult because they are unsuited for imaging with gamma cameras which were widely used for other radiodiagnostic purposes. Furthermore, $^{18}$F has a very short half-life of about only two hours which makes its distribution to users after it has been manufactured extremely difficult and expensive. To use $^{18}$F, the hospital had to be physically located close to a source of $^{18}$F which was generated at only a few sites in the entire United States.

$^{85}$Sr has a longer half-life than $^{18}$F thus making its physical distribution easier, but it did not give a satisfactory image because it had poor biological characteristics for a radioactive scanning agent.

In June, 1970 at the annual meeting of the Society of Nuclear Medicine, Dr. Subramanian gave a presentation regarding the potential use of a $^{99m}$Tc-stannous-tripolyphosphate complex for radioactive scanning of bone. The paper describing Dr. Subramanian's presentation was published by Subramanian in *Radiology*, Vol. 99: 192–196 (April 1971).

Phosphates are compounds containing phosphate units connected by phosphorous-oxygen bonds. Orthophosphate is a single phosphate unit; pyrophosphate is a polyphosphate with two PO$_4$ atoms. Tripolyphosphate is a phosphate with three PO$_4$ atoms. Long chain polyphosphates have greater than three PO$_4$ atoms.

Stannous is a form of tin. When stannous is associated with pertechnetate, it will act as a reducing agent and reduce the pertechnetate resulting in a more reactive and a more useful $^{99m}$Tc.

A complex is a term commonly used in the radio-pharmaceutical field when the exact chemical structure is unknown. As used in the radio-pharmaceutical field, a complex is the association of two or more chemical species, such that when they are admixed together, the chemical and/or biological properties of one or more of the species are changed.

To be useful as a scanning agent for a particular body component, the potential radio-pharmaceutical should have a target to non-target ratio of about 10. A target to non-target ratio of less than five indicates that the material is not satisfactory for scanning that particular component. The biodistribution reported by Dr. Subramanian for the tripolyphosphate complex was unacceptable as a bone scanning agent. It was also reported that orthophosphate, another technetium labeled monophosphate, had unsatisfactory skeletal localization.

The April 1971 Subramanian publication described making the complex by admixing a solution of stannous chloride with $^{99m}$Tc in the form of pertechnetate followed by addition of a solution of the polyphosphate, thereby forming a $^{99}$Tc-stannous-polyphosphate complex.

In June of 1971, Dr. Subramanian gave another presentation where he reported that a stannous-technetium–99m labeled long chain polyphosphate complex provided very good bone imaging characteristics.

He reported that the use of a long chain polyphosphate, i.e. PP–46, having an average molecular weight of 4600 (46 phosphate units) provided much better bone imaging than that obtained for the technetium–99m-stannous-tripolyphosphate complexes previously reported.

He also reported around June, 1971 that the technetium–99m-stannous-tripolyphosphate complexes gave only partly satisfactory bone imaging and that the various technetium labeled monophosphates were unsatisfactory. An abstract of this report was published in June, 1971.

Subsequently, in March 1972, Dr. Subramanian, published a more detailed paper

describing the work announced in the June, 1971 presentation. This paper disclosed that the long chain-polyphosphate-[99mTc]-stannous complex was made in the same manner as the tripolyphosphate complex. This March, 1972 paper also reported that other preparations using still longer chain polyphosphates having average chain lengths ranging from 55 to 58 also gave excellent images when administered as a [99mTc]-stannous-polyphosphate complex.

There was no colloid formation as a result of the procedure Subramanian used to form the complex. This is shown by looking at biodistribution, which indicates that no extra amount of radiation went to the liver, where it would have gone if any colloid had formed. The biodistribution also reflected by Subramanian shows that there was no free pertechnetate in the solution injected. Dr. Subramanian indicated that the phosphate material, on which he reported in his June, 1971 presentation and abstract, and in his March, 1972 article, was a polyphosphate that by end group titration had an average chain length of 4600.

Hydroxylapatite is the main inorganic constituent of bone. It is used as a model for in vitro (outside the body) tests but lacks all the in vivo (inside the body) constituents of bone and thus is not a dependable model for in vivo predictions. In vivo models using linear phosphates do not provide the same results as the in vitro models because of the effects of enzymes on the phosphates.

In addition to Subramanian teaching that long chain polyphosphates would make a better bone scanning agent, there were other teachings at that time, that suggested that long chain materials would be the correct approach. Anghileri and Miller disclosed that when using polyphosphates and orthophosphates labeled with P–32 for therapy, the long chain polyphosphates had a higher uptake in bone than orthophosphate. Plaintiff, defendant, Dr. Davis and others skilled in the art were led to believe by the Subramanian publications and presentations that longer chain polyphosp-

hates were superior to shorter chain polyphosphates and would provide a clinically useful product. They were unable, however, to consistently reproduce the results reported by Subramanian when using long chain polyphosphates.

Those attempting to reproduce Dr. Subramanian's work included Dr. Davis, the defendant, Mallinckrodt, the inventors, Adler and Camin, as well as Dr. Subramanian himself. Following the teachings of Dr. Subramanian, they all continued to work with long chain polyphosphates, believing that they only needed to find the long chain polyphosphate having the right chain length. Long chain polyphosphates, however, never became clinically useful or commercially successful.

On November 8, 1971, plaintiff's Adler and Camin fractionated a commercial polyphosphate composition and discovered that, contrary to the teachings of Dr. Subramanian, the short chain fraction containing pyrophosphate, when complexed with stannous and labeled with [99mTc], gave an excellent biodistribution for use as a bone scanning agent.

The original purpose of the fractionation experiment by Adler and Camin was to produce a long chain polyphosphate fraction that would provide a bone scanning agent. Although a long chain fraction was obtained, they found that it did not provide a good biodistribution for a bone scanning agent. Instead, they discovered that the short chain fraction containing pyrophosphate formed a better bone agent when labeled with [99mTc]. The active ingredient in this short chain fraction was found by Adler and Camin to be pyrophosphate.

In addition, Adler and Camin found, contrary to Dr. Subramanian's teachings, that the presence of large amounts of linear polyphosphates greater in molecular weight than pyrophosphates actually reduced the effect of the short chain polyphosphates as a radioactive scanning agent. By mid-November, 1971, Adler and Camin confirmed that they had a reproducible composition that consistently gave excellent results as a bone scanning agent in

animal models which were predictive for humans. The composition contained pyrophosphate as the active ingredient and less than 25% by weight of linear polyphosphates having a molecular weight (or number of phosphate units) greater than pyrophosphate. In addition to giving consistently excellent images, the $^{99m}$Tc-stannous-pyrophosphate complex discovered by Adler and Camin unexpectedly had a blood clearance and bone uptake more rapid than other $^{99m}$Tc labeled inorganic polyphosphates, while the uptake by marrow, kidneys and skeletal muscle was less. The discovery that stannous-pyrophosphate complexes resulted in high bone uptake and good blood clearance was at variance with Dr. Subramanian's earlier reports advocating the use of long chain polyphosphates.

Dr. Subramanian informed NEN on September 28, 1971, that his new stannous polyphosphate kit was a lyophilized (freeze-dried), one component mixture. Sometime before December 6, 1971, Adler and Camin packaged freeze-dried, sterile samples of their composition in a nitrogen atmosphere in sealed, sterile, non-pyrogenic vials. On that date, Dr. Subramanian added to each vial a sterile pertechnetate solution to form $^{99m}$Tc-stannous-pyrophosphate complex in a solution which was injected intravenously into rabbits and radioactive bone scans were obtained. On that day, Dr. Subramanian said these samples were clinically useful.

By late December, 1971 after the successful bone scan, NEN had decided to commercialize the discovery by Adler and Camin and proceeded to expeditiously do so (a) by making sterile, pyrogen-free batches of the composition and packaging them in the form of sealed, sterile, pyrogen-free vials in a nitrogen atmosphere, (b) by carrying out the necessary analyses and toxicity, stability and other tests required to file an IND (application to the Food and Drug Administration (FDA) to investigate a new drug) which is necessary for clinical testing, (c) by promptly filing the IND with the FDA, (d) by clinically testing with humans as soon as permitted under the regulatory laws and (e) by proceeding with the preparation of a patent application.

In NEN's commercialized product, the composition containing the stannous-pyrophosphate complex was sterile and pyrogen-free and was packaged in the form of a freeze-dried solid in a nitrogen atmosphere in sealed, sterile, pyrogen-free vials.

On May 12, 1972, plaintiff filed its original submission to the FDA for an investigational exemption for a new drug application (IND) relating to its stannous-pyrophosphate product for use as a bone scanning agent. Plaintiff's original submission to the FDA for a new drug application (NDA) for its stannous-pyrophosphate product for use as a bone scanning agent was filed on December 26, 1974. On November 19, 1976, plaintiff's product was approved by the FDA for this use.

On October 20, 1978, plaintiff filed a supplement to its NDA submission relating to this product, requesting that the product be approved for the additional indication of myocardial infarct (heart attack) imaging. On June 30, 1982, the FDA advised plaintiff that this request for the additional indication was approvable by the FDA, and formal approval was obtained on March 2, 1983.

On August 4, 1978, plaintiff filed a supplement to its NDA submission to the FDA relating to its product, requesting that the FDA approve an additional indication of blood pool imaging. On March 2, 1983, the FDA approved the use of plaintiff's product for this additional indication.

By 1974, the invention of Adler and Camin had displaced pre-existing $^{18}$F and $^{85}$Sr bone scanning agents in the clinical market.

Mallinckrodt's development of its Technescan PYP product began after the 1971 meeting of the Society of Nuclear Medicine at which Dr. Subramanian presented a paper on the use of technetium-labeled polyphosphates for skeletal imaging. James Brown, Director of Research for Radiopharmaceuticals for Mallinckrodt, was in attendance at the meeting. When the meeting concluded, Brown informed his su-

periors of the substance of the meeting. As a result, a decision was made to pursue the development of such a bone scanning agent.

In about October of 1971, Mallinckrodt hired a Dr. Philip Benjamin whose responsibilities included the development of a technetium-labeled phosphate bone agent. After this project was started, Dr. Benjamin worked with several different phosphate lengths. Over the following months, Dr. Benjamin worked with pyrophosphate, tripolyphosphate and polyphosphates that he prepared from orthophosphate. In the course of his work, Dr. Benjamin pursued two approaches simultaneously; he pursued both the long chains and the short chains to determine the optimum chain length for skeletal imaging.

The defendant was not able to obtain reproducible and good results with the use of long chain polyphosphates. When Dr. Benjamin reported to his superiors that he could only obtain disappointing results with the long chain polyphosphates, he was told to go back and keep working. The defendant, in fact, took a license with respect to using Subramanian's long chain polyphosphates and signed this license on April 26, 1972.

As a result of his work, Dr. Benjamin came to the conclusion that the very short chain phosphates gave good animal results when evaluated against the bone imaging protocol. The experiments to determine the optimum chain lengths for skeletal imaging were carried out in the latter part of 1971 and into the early part of 1972.

Dr. Benjamin reported the results of this work and his conclusion that it was the short chain phosphates that showed the most promise as skeletal imaging agents to Mr. Brown in January, 1972. Prior to July, 1972, Dr. Benjamin suggested that Mallinckrodt had two options for a bone scanning agent: pyrophosphate and tripolyphosphate.

Ultimately, the decision was made by Mallinckrodt to market the pyrophosphate bone agent over the tripolyphosphate bone agent under the trademark Technescan

PYP. The final decision to select pyrophosphate was made at about the time of the July, 1972 meeting of the Society of Nuclear Medicine. At that meeting, Dr. Cohen of CEA, the French atomic energy concern, reported the use of technetium labeled stannous pyrophosphate in skeletal imaging.

After Dr. Benjamin left Mallinckrodt, Mr. Orville Harris was assigned to work on the project. After Mr. Harris left Mallinckrodt approximately six months later, Dr. Wolfangel was assigned to the project. Dr. Wolfangel's responsibilities included completing those activities that were necessary in order to market the drug and to complete the technical information that was needed for the New Drug Application to be sent to the FDA. On November 19, 1973, defendant filed its original submission to the FDA for a new drug application (NDA) relating to its Technescan PYP for use as a bone scanning agent. On May 28, 1974, defendant's Technescan PYP product was approved by the FDA for this use.

On January 9, 1976, defendant filed a supplement to its NDA submission relating to Technescan PYP, requesting that this product be approved for the additional indication of myocardial infarct imaging. On January 12, 1977, defendant's request for the additional indication was approved by the FDA.

On October 21, 1977, defendant filed a supplement to its NDA submission to the FDA relating to its Technescan PYP product, requesting that the FDA approve an additional indication of blood pool imaging. ON November 9, 1978, the FDA approved the use of defendant's Technescan PYP product for this additional indication.

Defendant has been commercially selling its Technescan PYP product for use in connection with the three indications approved by the FDA since the respective dates for each approval. Defendant's sales of its Technescan PYP product increased substantially after defendant obtained FDA approval of its use for blood pool imaging. The composition of defendant's Technescan

PYP product has remained unchanged from the first sale thereof to date. The contents of the Technescan PYP product vial have been identified in the package insert which accompanied each Technescan PYP kit sold after May 28, 1974. At some point in time after the FDA approved the use of defendant's Technescan PYP product for blood pool imaging, this use became and is currently the principal use of Technescan PYP.

Prior to May, 1974, but substantially after NEN had already begun distributing its stannous-pyrophosphate kits for clinical trials in June of 1972, the defendant set up facilities to manufacture its stannous-pyrophosphate product, because approval of the facilities and manufacturing process is part of the approval required in the NDA. All of this was accomplished before NEN's U.S. Patent No. 3,824,044 issued on November 26, 1974.

The three patents in suit matured from a common application for patent that was filed by plaintiff based on the invention of Adler and Camin on September 13, 1972. This application was based on the invention that a technetium labeled stannous-pyrophosphate complex could be effectively used as a skeletal imaging agent.

After a restriction requirement by the Patent Office, the claims of the original application were divided into three separate applications which matured as three patents in suit on November 26, 1974, April 5, 1977 and April 4, 1978, respectively.

In 1972, three papers were published by three separate groups on a $^{99m}Tc$ tin complex with HEDP, a diphosphonate. For a short while thereafter, there were competitive articles in the literature debating whether the HEDP produced by Proctor & Gamble was superior to pyrophosphate or whether the converse was true. It quickly became clear, however, that the diphosphonates were superior agents and the arguments were reduced to which diphosphonate was best, MDP or HEDP. By at least 1975, it was well recognized that MDP was the bone scanning agent of choice over both pyrophosphate and HEDP.

It is common in the radiopharmaceutical industry for radioscanning agents used for one purpose to be tried for scanning other target areas. A number of radioscanning agents have been found to be useful for scanning more than one target area. By the end of 1974, the stannous-pyrophosphate complexes of the patents in suit began to be used for forming $^{99m}Tc$-complexes to diagnose myocardial infarcts (heart attacks). In 1975, stannous-pyrophosphate began to be used to form $^{99m}Tc$ complexes for radioactive blood pool imaging for diagnosis of pulmonary dysfunction, i.e. used to cause the $^{99m}Tc$ to be selectively collected and concentrated in vivo in or on the red blood cells. This discovery was made by Pavell and Zimmer independently of either plaintiff or defendant.

In blood pool imaging, stannous-pyrophosphate is administered intravenously in a saline solution. $^{99m}Tc$ pertechnetate is subsequently administered about 30 minutes thereafter. This technetium is apparently subsequently reduced by the stannous ion and is either bound to or entrapped in red blood cell and is not free within the blood stream. It is reduced and is bound to some species and is no longer pertechnetate and accordingly, a $^{99m}Tc$ complex has been formed. If stannous ion is administered without first complexing it (e.g. with pyrophosphate), some labeling will occur, but not to the extent as occurs when it is complexed first. If pertechnetate is added without the prior administration of stannous-pyrophosphate, it does not bind to the cells. It is accepted by most experts in the field, that the stannous collects or concentrates on or in the red blood cells and reacts with the subsequently administered pertechnetate to reduce it to form a technetium complex, the exact structure of which is not presently known. The success of blood pool imaging is directly attributable to the development of the gating device which permits the clinician to obtain diagnostic information which was much more difficult to obtain through other means.

Plaintiff formally charged defendants with infringement of the 044, 249 and 840 patents on August 1, 1983. The charge of infringement arose from the sale and manufacture by defendant of Technescan PYP. Technescan PYP is a sterile, pyrogen-free, lyophilized solid contained in a 10 milliliter type 1 glass vial in a nitrogen gas atmosphere. Each vial of Technescan PYP contains 15.4 milligrams of stannous pyrophosphate (12.0 mg. of sodium pyrophosphate and 3.4 mg. stannous chloride, calculated as the anhydrous salts). The contents of the vial are under a nitrogen atmosphere and the pH of the solution is adjusted by hydrochloric acid prior to lyophilization.

Technescan PYP is manufactured by mixing ACS grade sodium pyrophosphate ($Na_4P_2O_7$) with sterile water for injection, stirring until dissolved under a nitrogen atmosphere, mixing the resulting solution with ACS grade stannous chloride dihydrate ($SnCl_2$), stirring until dissolved with continued nitrogen dispersion, adjusting the pH of the resulting solution to $5.05 + 0.05$ with 1N HCl, and using sterile water for injection to dilute the resulting solution to the proper volume and mixing thoroughly.

The resulting solution is then filtered, dispensed into vials and lyophilized (freeze-dried) under a nitrogen atmosphere under antiseptic conditions. The vials are then stoppered and crimped.

The dosage and administration protocol varies according to the intended use of Technescan PYP. When used as a blood pool imaging agent, Technescan PYP is reconstituted with sterile, pyrogen-free normal saline containing no preservatives. A dose of 5 to 15.4 milligrams is administered intravenously 30 minutes prior to the intravenous administration of 15 to 20 millicuries of sodium pertechnetate $^{99m}Tc$. It is recommended that Technescan PYP be injected by direct venepuncture and that imaging be done 10 minutes following administration of sodium pertechnetate $^{99m}Tc$ utilizing a gamma scintillation camera interfaced to an electrocardiographic gating device.

When used for bone and cardiac imaging, Technescan PYP is reconstituted with sodium pertechnetate Tc–99m and the Technescan PYP–Tc–99m is injected intravenously over a 10–to–20 second period. For optimal results, bone imaging should be done one to six hours following administration and cardiac imaging should be done 60 to 90 minutes following administration. Acute myocardial infarcts can be visualized from 24 hours to nine days following onset of symptoms, with maximum localization at 48 to 72 hours. Cardiac imaging should be done with a gamma scintillation camera and it is recommended that images be made of the anterior, left anterior bleak and left lateral projections.

The weight ration of stannous tin to pyrophosphate added to the Technescan PYP reaction vial is in the range of $10^{-3}$ to 0.50.

Plaintiff acquired a sample of defendant's Technescan PYP and conducted a biodistribution study utilizing the sample on or about September 23, 1974. Plaintiff became aware of defendant's manufacture and sale of its Technescan PYP product at least as early as 1974 through defendant's promotional material. The contents of the Technescan PYP product vial were identified in the package insert which accompanied each Technescan PYP kit sold after May 28, 1974.

The composition comprising an admixture of stannous chloride and sodium pyrophosphate sold by Mallinckrodt under the name of Technescan PYP when admixed with $^{99m}Tc$-pertechnetate in accord with directions provided in the package insert form a sterile, non-pyrogenic solution in a pharmaceutically acceptable vehicle at a pH between 3 and 8.

At some time after the FDA approved the use of defendant's Technescan PYP product for blood pool imaging, this use became and is currently the principal use of Technescan PYP sold by defendant. Nevertheless, defendant's Technescan PYP product has been approved by the Food and Drug Administration ("FDA") for three different diagnostic indications, i.e. bone im-

aging, cardiac imaging and blood pool imaging.

Mesmer and Irani, *Journal of Inorganic Nuc. Chem.*, Vol. 28:493–502 (1966), was identified by applications that became the 044, 249 and 840 patents. In connection with the Mesmer and Irani reference, it was stated in the specification of the application that became the 044, 249 and 840 patents that, "[i]t has also been known for some time that stannous ion $Sn^{++}$ forms soluble complexes with long chain polyphosphates."

Vaid et al. "Pyrophosphate complexes of Tin and Zinc," *Current Science 6*:170 (1953) (Vaid I) was identified by applicants to the PTO during the prosecution of the application that became the 840 patent.

Mesmer and Irani do not describe stannous-pyrophosphate compositions that are stated to be sterile and non-pyrogenic.

Vaid I; Rama Char, "Electroplating from the Pyrophosphate Bath", *Electroplating & Metal Finishing:* 347–49 (November 1957); and Vaid et al., "Physio-Chemical Studies on Pyrophosphate Complexes of Bivalent Metals", *Bull. India Sect. Electrochem. Soc. 7*:5–13 (1958) (Vaid II), and Purin, et al., "The Electrode Potential of Tin in Solutions of the Pyrophosphate Complex", *Izvestiya Akademii Nauk of the Latvian SSR*, Chemical Series No. 3: 227–281 (1968) do not describe stannous-pyrophosphate compositions that are stated to be sterile and non-pyrogenic.

No prior art publication discloses a composition, solution, or method of forming $^{99m}Tc$ complexes for radioactive scanning containing a stannous-pyrophosphate complex.

Mesmer describes experiments illustrating the dissolution at various pH's of stannous oxide powder by solutions containing various concentration of phosphates, such as pyrophosphate, tripolyphosphate and longer chain polyphosphate made up to an ionic strength of unity with sodium perchlorate. There is no description or suggestion in Mesmer of any radiopharmaceutical or radioscanning agent. Mesmer does not describe stannous-pyrophosphate composi-

tions that are sterile and non-pyrogenic. There is no suggestion in Mesmer to make any of the compositions sterile and pyrogen-free. Further, there is no suggestion for packaging any of the compositions in the form of a freeze-dried solid in a sterile, pyrogen-free sealed container. There is no suggestion in Mesmer that pyrophosphate would be a better radioscanning agent than any other polyphosphate.

Mesmer made an assumption that perchlorate was inert. However, perchlorate could form a complex with similar metals. Further, analyses performed on one of the Mesmer compositions indicate that perchlorate is, in fact, not inert but effects the complex formed and that the complex formed in accord with Mesmer is a different complex than the stannous pyrophosphate complex of the invention. Biodistributions performed using a Mesmer composition show that the complex behaves differently than a complex prepared according to the present invention.

Vaid I describes stannous-pyrophosphate complexes having a molar ratio of pyrophosphate to stannous of 1:2 and 1:1. There is no suggestion in Vaid I that any of the compositions disclosed therein would be useful as a radioscanning agent. There is no suggestion in Vaid I for making any of the compositions sterile, non-pyrogenic, and non-toxic for injection. Further, there is no suggestion for packaging any of the Vaid I compositions as a freeze-dried solid in a nitrogen atmosphere in a sealed sterile non-pyrogenic container purged of oxygen. There is no suggestion in Vaid I that pyrophosphate would be a better radioactive scanning agent than any other polyphosphate.

Vaid II provides a less detailed description than Vaid I and refers to Vaid I for preparation of suspensions of stannous-pyrophosphate. Vaid II provides no description or suggestion of any compositions as radioactive scanning agents. There is no suggestion for making any of the Vaid II compositions sterile, non-pyrogenic, and non-toxic for injection. Further there is no

suggestion for packaging any of the Vaid II compositions as a freeze-dried solid in a nitrogen atmosphere in a sealed, sterile, non-pyrogenic container purged of oxygen. There is no suggestion in Vaid II that pyrophosphate would be a better radioactive scanning agent than any other polyphosphates. There is no indication in Vaid II as to whether or not the amount of pyrophosphate added would all go into solution. There is no indication in Vaid I or Vaid II that any precautions were made to prevent oxygen from oxidizing the stannous to stannic.

Purin described an investigation of the electrode potential of tin in the pyrophosphate complex of divalent tin, taking into account the oxidation solution of divalent tin, (i.e. stannous) to tetravalent tin (i.e. stannic). There is no description or suggestion of any Purin compositions as radiopharmaceutical radioscanning agents. There is no suggestion in Purin for making any of the compositions sterile, non-pyrogenic and non-toxic for injection. Further, there is no suggestion for packaging any of the Purin compositions as a freeze-dried solid in sterile, pyrogen-free, sealed containers purged of oxygen. There is no suggestion in Purin that pyrophosphate would make a better radioactive scanning agent than any other polyphosphates. Purin does not indicate that any precautions are taken to avoid oxidation of the stannous to stannic. Approximately 15% of the stannous in Purin was oxidized to stannic, with ranges varying from 10 to 19%. The large amounts of tin present as stannic in Purin have no radiopharmaceutical use. It is undesirable to inject large amounts of stannic tin or any other unnecessary foreign material into a patient. In a radiopharmaceutical, it would be undesirable to have the amounts of potassium pyrophosphate that were used in Purin.

Rama Char describes a tin-plating solution that has pyrophosphate to complex the tin in solution. There is no suggestion in Rama Char of any compositions as radioactive scanning agents. There is no suggestion in Rama Char for making any of the compositions sterile, non-pyrogenic and non-toxic for injection. Further, there is no suggestion for packaging any of these compositions as a freeze-dried solid in a sealed, sterile, non-pyrogenic container purged of oxygen. There is no suggestion in Rama Char that pyrophosphate would be a better bone scanning agent than any other polyphosphates. Rama Char does not specify that any care was taken to avoid the presence of oxygen in the solutions made. If oxygen was present, the stannous would oxidize to stannic. The pH used in Rama Char solution was at least about 9.0. Rama Char uses ingredients in his solution, dextrin and gelatin, upon which microorganisms could grow.

Vaid I; Rama Char, *Electroplating & Metal Finishing:* 347–49 (November 1957); Vaid et al., "Physico-chemical Studies on Pyrophosphate Complexes of Bivalent Metals", *Bull. India Sect. Electrochem. Soc. 7:*5–13 (1958) (Vaid. II), and Purin, et al., "The Electrode Potential of Tin in Solutions of the Pyrophosphate Complex", *Izvestiya Akademii Nauk of the Latvian SSR,* Chemical Series No. 3: 227–281 (1968), do not describe stannous-pyrophosphate compositions that are sterile and non-pyrogenic.

It is standard when evaluating different radiopharmaceuticals to do both biodistributions and scans together. When doing a test, it is normal practice to use at least three animals per experiment, to indicate that the results are reproducible. If only one animal is used, it is possible that something could be wrong with that experiment. The photographs prepared for Defendant's Exhibit 252 were for qualitative purposes, not quantitative purposes. In preparing the solution for these tests, Dr. Deutsch took precautions to avoid oxidation of the stannous to stannic. Further, Dr. Deutsch knew that he was preparing these solutions to inject intravenously into an animal. Based upon a single picture and no biodistribution it is not possible to determine if any of these materials would be clinically useful in humans.

Mesmer and Irani, *Journal of Inorganic Nuc. Chem.*, Vol. 28: 493–502 (1966), was identified to the Patent Office in the specification of the original application that became the 044, 249 and 840 patents. Applicants gave the complete journal, volume and page number citation to the Mesmer article when citing it to the PTO. Vaid et al., "Pyrophosphate complexes of Tin and Zinc," *Current Science 6*:170 (1953), (Vaid I) was identified to the PTO by applicants during the prosecution of the application that became the 840 patent. A copy of the Vaid I reference, was submitted to the PTO during the prosecution of the application that became the 840 patent.

The review article by Fleisch and Russell contains no reference to radioactive scanning. The gist of the article deals with the use of phosphates to regulate metabolism.

In July, 1973, Mallinckrodt filed a patent application claiming stannous-pyrophosphate and technetium–99m-stannous-pyrophosphate compositions as inventions. Defendant was aware of the existence of U.S. Patent No. 3,851,044 on December 5, 1975 and initiated an interference between the 044 patent and their Benjamin patent application filed in July, 1973, and covering the same stannous-pyrophosphate complex. Mallinckrodt's July, 1973 patent application filed in the name of Dr. Benjamin claimed as an invention sterile, lyophilized stannous-pyrophosphate and $^{99m}$Tc labeled stannous-pyrophosphate.

On September 27, 1977, an interference was declared between Mallinckrodt's patent application and DuPont's 044 patent to determine priority of inventorship between the parties. Prior to the declaration of interference, plaintiff was unaware of any pending application filed by Mallinckrodt which related to stannous phosphate bone imaging agents.

Simultaneously with the declaration of interference, the Board of Patent Interferences stated that Mallinckrodt's showing was insufficient to prima facie entitle it to an award of priority with respect to the effective filing date of the 044 patent. The Board of Patent Interferences further stated that summary judgment would be rendered against Mallinckrodt unless on or before October 31, 1977 it could show cause why such action should not be taken. On October 26, 1977, Mallinckrodt filed a motion for an extension of time of 30 days in which to respond to the show cause order and on November 1, 1977, NEN filed an opposition to this motion stating that "[i]t is believed that the request for extension is for purposes of delay which is harmful to the party Adler et al. since the interference represents a cloud on the patent interference and any delay will prolong the existence of such cloud." Mr. Klosterman, patent attorney for defendant, never advised management or the business people that NEN had filed an opposition to the request for an extension of time in the interference. Mallinckrodt was granted an extension of time to and including November 21, 1977 to respond to the show cause order.

Mallinckrodt never filed a response to the show cause order and on December 7, 1977 the Board of Patent Interferences awarded priority to NEN.

Mallinckrodt never made a determination of whether the manufacture, sale or use of Mallinckrodt's Technescan PYP infringed NEN's 044 patent. Mr. Klosterman did not conduct any study of NEN's 044 patent to determine whether it was valid and enforceable.

Prior to August 1983, Mallinckrodt never obtained an opinion or made a determination regarding whether its manufacture and sale of Technescan PYP infringed or induced infringement of any of the NEN patents in suit. Prior to August 1983, Mallinckrodt never obtained an opinion or made a determination on whether any of the NEN patents in suit were valid. Prior to August 1983, Mallinckrodt never obtained an opinion or made a determination as to whether any of the three patents in suit were enforceable.

Defendant continued to make and to sell Technescan PYP without any evaluation of any of the NEN patents. Prior to May 1974, Mallinckrodt set up facilities to manufacture its Technescan PYP. Approval of

the facilities and manufacturing process is part of the approval of the NDA. Mallinckrodt developed and commercialized Technescan PYP believing it owned the patent rights covering the product. When Mallinckrodt learned of NEN's patent in December, 1975, it decided to provoke an interference in the United States Patent and Trademark Office in order to have the patent awarded to it instead of NEN. Until this time, all capital expenditures made by Mallinckrodt in connection with Technescan PYP were made relying on the fact that it owned the patent rights covering Technescan PYP.

No significant expenditures were made by Mallinckrodt after 1978 in connection with Technescan PYP and indeed, the few minor expenditures actually made in connection with Technescan PYP were for the production of a number of products that are manufactured using the same facilities and not solely for Technescan PYP. Mallinckrodt made all major capital expenditures in connection with the manufacture of Technescan PYP before December, 1977 and such expenditures were generally not solely for the production of Technescan PYP (i.e. the production of Technescan PYP was only incidental). There was no harm or injury in terms of out-of-pocket expenses to Mallinckrodt because of any delay by NEN in bringing legal action for its patents in suit, nor did Mallinckrodt do or fail to do anything because of any delay by NEN in bringing action on the patents.

Defendant's management is unaware of any decision made prior to August, 1983 with respect to continuing the manufacture or stopping the manufacture of Technescan PYP based either upon any action or lack of action by plaintiff with respect to the patents in suit.

All of the work required for the submission to the FDA for all three indications for Technescan PYP were completed before the interference was resolved and before the 840 patent issued. All the work required for the initial submission to the FDA for Technescan PYP was completed before October, 1973. All of the work required for the supplement for myocardial infarct imaging was completed before January 9, 1976, and all of the clinical work required for the supplement for blood pool imaging was completed prior to October 21, 1977. Defendant has not spent any substantial amount of money since 1978 on equipment used solely for the production of Technescan PYP.

On August 2, 1977, the Canadian Patent Office declared a conflict between NEN's Canadian patent application corresponding to NEN's U.S. application (filed September 13, 1972), and a patent application assigned to Commissariat a l'energie Atomique (CEA). Under Canadian patent law, a conflict is declared between two patent applications to determine priority of inventorship similar to an Interference proceeding in the United States Patent and Trademark Office. In the Canadian conflict proceeding evidence of invention from anywhere in the world, including acts of invention or reduction to practice in the United States, can be introduced for determining priority of invention. Both the NEN Canadian application and the CEA Canadian application disclosed a stannous-pyrophosphate complex for forming a complex with $^{99m}Tc$ radioactive scanning. This raised a cloud on the title to this subject matter until the conflict was resolved. On February 25, 1980, the Canadian Patent Office awarded priority to NEN's Canadian patent application with respect to claims to a solution of the $^{99m}Tc$-stannous-polyphosphate and method of making the same.

As a result of DuPont's acquisition of NEN, time was necessary for DuPont's legal department to become familiar with the acquired company, and to evaluate the various patents owned by NEN.

The question regarding whether defendant infringed U.S. Patent 3,851,044 was raised in discussions among plaintiff's management. The exact time is not known, but some discussions probably occurred in the period of 1976–1978.

The question regarding whether defendant infringed U.S. patent 4,016,249 was probably raised in discussions among plain-

tiff's management. The exact time is not known, but some discussions probably occurred in the period April 5, 1977 through 1978.

The question regarding whether defendant infringed U.S. patent 4,082,840 was raised in discussions among plaintiff's management. The exact time is not known, but some discussions probably occurred in 1978 during the period after the issuance of the 840 patent on April 4, 1978. Mallinckrodt's sales of Technescan PYP are agreed to have been as follows for the years 1974–1984: $492,038 in 1974, $1,546,881 in 1975, $1,837,552 in 1976, $2,219,736 in 1977, $1,843,151 in 1978, $2,174,699 in 1979, $3,371,896 in 1980, $4,879,294 in 1981, $5,766,125 in 1982, $5,677,082 in 1983, $4,616,833 in 1984 and $2,289,460 through July 15, 1985.

## CONCLUSIONS OF LAW

Section 271 of 35 U.S.C. provides in pertinent part under paragraph (a) that:

"Whoever without authority makes, uses or sells any patented invention within the United States during the term of the patent therefore infringes the patent."

The patent owner has the burden of proving infringement by a preponderance of the evidence. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed.Cir.1984).

In order to reduce the issues at trial, plaintiff asserted only claims 1, 13, 14, 16, 18, 19, 20, 27 and 28 of the 840 patent; claims 1, 7 and 10 of the 044 patent; and claims 1, 5 and 19 of the 249 patent.

The claims of all the patents in suit are attached as an appendix to this opinion.

A patent is presumed valid and the burden of establishing invalidity as to any claim of a patent rests upon the party asserting such invalidity. *Ashland Oil, Inc. v. Delta Resins and Refractories, Inc.*, 776 F.2d 281, 291 (Fed.Cir.1985), *cert. denied* — U.S. ——, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986). Each claim of a patent is entitled to a presumption of validity and is to be treated as a complete and independent invention pursuant to 35 U.S.C. §§ 282 and 288. *Interconnect Planning Corp. v.*

*Feil,* 774 F.2d 1132, 1137 (Fed.Cir.1985). The presumption of validity is a procedural device that mandates that the party asserting invalidity bears the initial burden of establishing a *prima facie* case of obviousness under 35 U.S.C. § 103. *Ashland Oil,* 776 F.2d at 291, *citing Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534 (Fed. Cir.1983).

Once a *prima facie* case has been established, the burden shifts to the patentee to go forward with rebuttal evidence showing facts supporting nonobviousness. The party asserting invalidity, however, also retains the burden of persuasion on the issue of obviousness until a final judgment is rendered. *Ashland Oil,* 776 F.2d at 291–292.

■ The Court finds that the patents in suit are valid and enforceable.

Mallinckrodt's Technescan PYP, when used as a bone imaging agent and a cardiac imaging agent, infringes claims 1, 13, 14, 27 and 28 of the 840 patent; and the manufacture of Technescan PYP when used for these two indications, bone imaging and cardiac infarct imaging, infringes claims 16, 18, 19 and 20 of the 840 patent.

When Technescan PYP is reconstituted in vitro using pertechnetate in accordance with the directions of Mallinckrodt, a solution of $^{99m}$Tc-stannous-pyrophosphate complex for intravenous administration is formed which infringes claims 1, 7 and 10 of the 044 patent and at least claim 1 of the 249 patent. When the reconstituted Technescan PYP is used for skeletal imaging it infringes claims 5 and 19 of the 249 patent. The sale of Technescan PYP with directions for reconstituting with pertechnetate for imaging of bone and cardiac imaging induces others to infringe claims 1, 13, 14, 27 and 28 of the 840 patent and also claims 1, 7 and 10 of the 044 patent and claims 1, 5 and 19 of the 249 patent for these specific indications.

■ When the party asserting invalidity must rely upon a combination of prior art references to establish invalidity, that

party bears the burden of showing some teaching or suggestion in those references which support their use in combination. *Id.* at 293. The party that asserts that a patent is invalid has the burden of proving that the claimed invention in issue would have been obvious by clear and convincing evidence. *Id.* at 287. Each fact forming the factual foundation upon which the Court bases its ultimate conclusion regarding the obviousness of the claimed subject matter as a whole must be established by clear and convincing evidence. *Id.* at 292.

■ When an attacker, in sustaining the burden imposed by § 282, produces prior art or other evidence not considered by the PTO, there is, however, no reason to defer to the PTO so far as its affect on validity is concerned. Indeed, new prior art not before the PTO may so clearly invalidate a patent that the burden is fully sustained merely by proving its existence and applying the proper law; that, however, has no affect on the presumption or on who has the burden of proof. *American Hoist and Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359–60 (Fed. Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

■ In order to anticipate a claim pursuant to 35 U.S.C. § 102, a single prior reference must disclose each element of the claim under consideration. *W.L. Gore & Assoc., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1554 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). The standard for lack of novelty, i.e. for anticipation, is one of strict identity. To anticipate a claim for a patent, a single prior art reference must disclose each and every element of the claimed invention. *SSIH Equipment S.A. v. United States Int'l. Trade Comm'n.,* 718 F.2d 365, 377 (Fed.Cir.1983).

In this case, there was no single prior art reference disclosing each element of the composition for forming $^{99m}$Tc complexes prepared in vitro for radioactive scanning containing a stannous-pyrophosphate complex as claimed or a $^{99m}$Tc-stannous-pyrophosphate complex formed in vitro or solutions of either of them. Each element of the claims in issue in this case is not found either expressly or under principles of inherency in a single prior art reference.

Further, the differences between the subject matter in this suit and the prior art is such that the subject matter as a whole was not obvious at the time the invention was made to a person having the ordinary skill in the art to which such subject matter pertains. 35 U.S.C. § 103.

Plaintiff, defendant, Dr. Davis, and others skilled in the art were led to believe by the Subramanian publications and presentations that longer chain polyphosphates were superior to shorter chain polyphosphates and provided a clinically useful product. They were unable, however, to consistently reproduce the results reported by Subramanian when using long chain polyphosphates. Those attempting to reproduce Dr. Subramanian's work included Dr. Davis, the defendant Mallinckrodt, inventors Adler and Camin, as well as Dr. Subramanian himself. Following the teachings of Dr. Subramanian, they all continued to work with long chain polyphosphates believing that they only needed to find the long chain polyphosphate having the right chain length. Long chain polyphosphates never became clinically useful or commercially successful.

Based upon Subramanian's papers, one would conclude that a good bone scanning agent could be obtained by the use of long chain polyphosphates in a $^{99m}$Tc-stannous-polyphosphate complex and the use of short chain polyphosphates resulted in unsatisfactory bone scanning agents.

■ To properly combine two references to reach the conclusion that the subject matter of a patent would have been obvious, case law requires that there must have been some teaching, suggestion or inference in either reference or both or knowledge generally available to one of ordinary skill in the relevant art which would have led one skilled in the art to combine the relevant teachings of those references. *Ashland Oil,* 776 F.2d at 297 n. 24.

In this case, there was no teaching, suggestion or inference in any references through combination or individually nor was there knowledge generally available to one of ordinary skill in the relevant art which would have led one skilled in the art to combine the relevant teachings or knowledge to arrive at the claimed inventions.

■ The Court concludes that the defendant's manufacture and sale of its Technescan PYP product for blood pool imaging is non-infringing. The use of defendant's Technescan PYP for blood pool imaging in accordance with the instructions provided in the Mallinckrodt insert does not directly infringe any of plaintiff's patents, specifically any claims of the 044, 249, or 840 patents.

35 U.S.C. § 112 provides:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

A claim may be written in independent or, if the nature of the case admits, in dependent or multiple dependent form.

Subject to the following paragraph, a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed. A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.

A claim in multiple dependent form shall contain a reference, in the alternative only, to more than one claim previously set forth and then specify a further limitation of the subject matter claimed. A multiple dependent claim shall not

serve as a basis for any other multiple dependent claim. A multiple claim shall be construed to incorporate by reference all the limitations of the particular claim in relation to which it is being considered.

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

■ The object of the statutory requirement that an application for a patent shall contain a written description of an invention and discovery and shall particularly point out and distinctly claim the subject matter which the applicant claims is his invention or discovery is to require the patentee to describe his invention so that others may construct and use it after expiration of the patent and to inform the public during the life of the patent of limits of the monopoly asserted so that it may be known which features may be safely used or manufactured without license and which may not. *Schriber-Schroth Co. v. Cleveland Trust Co.*, 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34 (1938).

■ The claims of a patent, therefore, measure the invention. *Smith v. Snow*, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1935). Said another way, the claims made in a patent are the sole measure of the grant. *ARO Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961).

■ In regards to possible uses of an invention, the benefit of uses of a patented invention belong to the patentee though not apparent at the time of the issuance of a patent. *Radio Corp. of America v. Radio Engineering Laboratories, Inc.*, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163 (1934). Thus, a patentee is entitled to every use of which his invention is susceptible whether such use be known or unknown to him.

*Potts v. Creager,* 155 U.S. 587, 15 S.Ct. 194, 39 L.Ed. 275 (1895).

Nevertheless, while in making a claim an inventor is at liberty to choose his own form of expression and while courts may construe the same in view of specifications in the state of the art, a court may not add to or detract from the claim so asserted. *Cimiotti Unhairing Co. v. American Fur Refining Co.,* 198 U.S. 399, 25 S.Ct. 697, 49 L.Ed. 1100 (1905).

As plaintiff is entitled to all uses to which its invention can be put, those uses are the utilization of the $^{99m}$Tc-stannous-polyphosphate complex intravenously administered for bone imaging and cardiac imaging. The use of the $^{99m}$Tc-stannous-polyphosphate complex for bone imaging was disclosed in the patents in suit. As for cardiac imaging, it was also found that the $^{99m}$Tc-stannous-polyphosphate complex formed in vitro and intravenously administered did localize in the dead areas of the heart but since the complex also went to the ribs, the use of the complex for myocardial infarct imaging was ignored. After it was discovered that a patient could be properly oriented and angled so as to see the heart without obstruction by the ribs, the pyrophosphate complex was used for myocardial infarct imaging for several years. This second use for myocardial infarct imaging was a susceptible use of plaintiff's invention even though it was not apparent at the time of the issuance of the patents in suit.

The use of defendant's Technescan PYP for blood pool imaging in accordance with the instructions provided in the Mallinckrodt insert, however, does not infringe any of plaintiff's patents as Technescan PYP is not admixed in vitro for use as a blood pool imaging but rather is by itself injected into a patient and thereafter the pertechnetate is injected into the patient. Such an in vivo reaction is not set forth in plaintiff's claims, is not the use to which plaintiff's inventions are susceptible and, in fact, plaintiff has limited his claims in the patents in suit to the complex formed in vitro, not in vivo. Specifically, in the 840 patent, claim 15 provides that plaintiff claims a sterile pyrogen-free composition for forming a bone seeking complex with $^{99m}$Tc. According to claim 1, said stannous-phosphate complex being in sterile aqueous solution at a pH of between 3 and 8 for *admixture* with a sterile pertechnetate solution of $^{99m}$Tc to form a $^{99m}$Tc labeled stannous-phosphate complex *for intravenous administration.*

Plaintiff DuPont has specifically and intentionally limited the claims of the patents in suit to $^{99m}$Tc-stannous-polyphosphate complexes formed in vitro.

A patent owner has no rights under a patent until the patent issues. *March v. Nichols, Shepherd & Co.,* 128 U.S. 605, 612, 9 S.Ct. 168, 170, 32 L.Ed. 538 (1888). As to the defense of laches and/or estoppel, the two essential elements underlying the defense of laches are 1) unreasonable and inexcusable delay in the assertion of the claim, and 2) material prejudice to the defendant resulting from this delay; but the longer the delay, the less need there is to show specific prejudice. *Leinoff v. Louis Milona & Sons, Inc.,* 726 F.2d 734 (Fed.Cir.1984). A delay exceeding six years is presumptively injurious to the infringer and the infringer does not need in such a case to produce any additional evidence of prejudice. *Id.* at 742. The result of the presumption after six years shifts the burden to the patent owner to prove the existence and reasonableness of an excuse for the delay and the patent owner bears the additional burden of showing lack of injury to the infringer caused by the delay. *Id.*

There has been no affirmative act by DuPont or its predecessor NEN which has mislead Mallinckrodt or upon which Mallinckrodt reasonably relied to its material prejudice. Further, defendant has not relied upon plaintiff's delay in instituting this suit nor has it been materially prejudiced by any delay.

The Court concludes that plaintiff's opposition to the extension of time in the interference action was not an indication to Mal-

linckrodt that NEN would sue them in the immediate future if the interference was found on NEN's behalf. The Court also concludes that plaintiff's failure to bring suit until 1983 was not unreasonable and inexcusable. Further, the Court concludes that defendant was not materially prejudiced by plaintiff's actions. In fact, plaintiff acted with reasonableness in its actions in this case as the Court's findings of fact indicate. Finally, defendant has not been injured by the delay as since 1978, Technescan PYP has been sold almost exclusively for blood pool imaging, an activity which does not infringe plaintiff's patents.

Finally, the Court concludes that the delay has not prejudiced defendant in the presentation of its case nor has it made any capital investments in the facilities to extend production of Technescan PYP as the facts indicate that defendant's capital expenditures for the production of Technescan PYP were made during the initial stages of defendant's entry in the pyrophosphate market, i.e. 1973 through 1975.

■■■■ As to the defense of equitable estoppel, estoppel is an equitable defense separate and distinct from laches and bars the patent owner from prospective as well as retroactive relief. To establish estoppel, the defendant in a patent case, in addition to showing the prerequisites of laches, must show an affirmative act by which he was misled by plaintiff. *Watkins v. Northwestern Ohio Tractor Pullers Ass'n.*, 630 F.2d 1155, 1160 (6th Cir.1980). Estoppel to assert the patent would thus require 1) an unreasonable and inexcusable delay; 2) prejudice to the defendant; 3) affirmative conduct by the patentee inducing the belief that it had abandoned its claims against the alleged infringer; and 4) detrimental reliance by the infringer. *Young Engineers, Inc. v. U.S. Int'l. Trade Comm'n.*, 721 F.2d 1305, 1317 (Fed.Cir. 1983). While more than silence is needed to support an estoppel defense, silence if sufficiently misleading may amount to an estoppel. *Id.*

The Court has previously found that there was no unreasonable and inexcusable delay by plaintiff in asserting its claims. Further, the Court concludes that there has been no prejudice to defendant, no affirmative conduct by DuPont inducing the belief that it had abandoned its claims against Mallinckrodt, nor has defendant detrimentally relied on any inactivity by plaintiff in enforcing its patents.

■■■■ As to defendant's claim of inequitable conduct by plaintiff, simple negligence, oversight or an erroneous judgment made in good faith is insufficient to show inequitable conduct. *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1559 (Fed.Cir. 1984), *cert. denied* —— U.S. ——, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). Where one knew or should have known that a piece of prior art or other information would be material, i.e. important to the PTO in making its decision, a failure to disclose that art or information can be sufficient proof that a wrong intent existed to mislead the PTO and may result in a finding of what has come to be called fraud on the PTO. The fact finder, however, must determine not only that the undisclosed art or information was material, but that the one charged with nondisclosure knew or should have known of its materiality at the time. *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1152 (Fed.Cir.1983).

■■■■ "Inequitable conduct" requires proof by clear and convincing evidence of a threshold degree of materiality of the nondisclosed or false information. *Lex Tex*, 747 F.2d at 1559.

■■■■ Gross negligence is sufficient to prove intent. *Id.* at 1560. Gross negligence is present when the actor, judged as a reasonable person in its position, should have known of the materiality of a withheld reference. *Id.* Inequitable conduct before the PTO that may render a patent unenforceable is broader than "common law fraud" and includes a failure to disclose material information. *Id.*

■■■■ Materiality of the non-disclosed or false information can be established by any of four tests: 1) objective "but for"; 2) subjective "but for"; 3) "but it may have

been"; and 4) PTO Rule 1.56a, i.e. whether there is a substantial likelihood that a reasonable examiner would have considered the admitted reference or false information important in deciding whether to allow the application to issue as a patent. *Id.*

■■■ Mesmer and Irani, *Journal of Inorganic Nuc. Chem.*, Vol. 28,:493–502 (1966) was identified to the Patent Office in the specification of the original application that became the 044, 249 and 840 patents. Applicants gave the complete journal, volume and page number citation to the Mesmer article when citing it to the PTO. Vaid et al. "Pyrophosphate complexes of Tin and Zinc," *Current Science 6*:170 (1953) (Vaid I) was identified to the PTO by applicants during the prosecution of the application that became the 840 patent. A copy of the Vaid I reference, was submitted to the PTO during the prosecution of the application that became the 840 patent.

The Court concludes that plaintiff did not withhold any material information or misrepresent any information to the PTO, especially with respect to the Mesmer and Irani or Vaid I references.

■■■ A potential infringer with actual notice of another's patent rights has an affirmative duty to exercise due care to determine whether or not he or she is infringing. *Underwater Devices, Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1389 (Fed.Cir.1983).

Under the specific facts and circumstances of this case, the Court in its discretion determines that defendant has not willfully infringed plaintiff's patents. Defendant is not chargeable with bad faith or willful infringement.

In conclusion, claims 1, 13, 14, 16, 18, 19, 20, 27 and 28 of the 840 patent are valid and enforceable, as are claims 1, 5 and 19 of the 249 patent and claims 1, 7 and 10 of the 044 patent. Mallinckrodt by the manufacture and sale of its Technescan PYP with instructions to admix it with $^{99m}$Tc for use as a bone scanning and cardiac imaging agent has induced and is inducing others to infringe the claims previously mentioned.

Mallinckrodt, however, by the sale of its Technescan PYP with instructions for use of Technescan PYP as a blood pool imaging agent (by which Technescan PYP is injected and thereafter pertechnetate is injected forming a complex in vivo) is not infringing any claims of plaintiff's patents.

Mallinckrodt has not met its burden of persuasion to prove its defenses of estoppel or laches nor has Mallinckrodt met its burden of persuasion to prove its defense of inequitable conduct.

Further, pursuant to 28 U.S.C. § 1292(b), the Court finds that this Order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from this Order will materially advance the ultimate termination of the litigation of this matter.

IT IS SO ORDERED.

### APPENDIX

#### 3,851,044

We claim:

1. A metabolizable radioactive bone seeking composition for in vivo concentrating $^{99m}$Tc in the skeletal structure of mammals comprising a technetium-99m-stannous-phosphate complex, the phosphate moiety of which comprises pyrophosphate, said phosphate moiety containing no more than 25% by weight of linear polyphosphate of formulation $P_nO_{3n+1}^{-(n+2)}$ having a molecular weight greater than pyrophosphate.

2. A bone seeking composition according to claim 1, said phosphate moiety being substantially free from said linear polyphosphate.

3. A metabolizable radioactive bone seeking composition according to claim 1, said phosphate moiety containing no more than 10% of said linear polyphosphates of molecular weight greater than pyrophosphate.

4. A composition according to claim 1, substantially 100% by weight of said phosphate moiety being said pyrophosphate.

5. A metabolizable, radioactive bone seeking composition according to claim 1, at least the major portion of any phosphate in said phosphate moiety other than pyrophosphate being selected from the group consisting of orthophosphate and ring phosphate of formula $P_nO_{3n}^{-n}$ and combinations thereof.

6. A composition according to claim 5, where the $n$ of said $P_nO_{3n}^{-n}$ is equal to 3.

7. A composition according to claim 1, at least 5% by weight of said phosphate moiety being said pyrophosphate.

8. A composition according to claim 1, said phosphate moiety comprising a mixture of said pyrophosphate, an orthophosphate and a ring phosphate of formula $P_nO_{3n}^{-3}$.

9. A composition according to claim 8 wherein $n$ is 3.

10. A composition according to claim 1, wherein at least about 90% of said phosphate moiety is said pyrophosphate.

11. A composition according to claim 1, substantially any phosphate in said phosphate moiety other than pyrophosphate being selected from the group consisting of a ring phosphate of formula $P_nO_3^{-n}$, one or more phosphates of formula $(P_nO_{3n+1})^{-(n+3)}$ of which not more than 10% by weight has an $n$ value greater than 2 and combinations thereof.

12. A composition according to claim 11, wherein not more than 5% by weight of said $(P_nO_{3+n})^{-(n+2)}$ has an $n$ value greater than 2.

References Cited

Subramanian et al.: Radiology, vol. 99, pp. 192 to 196, April 1971.

LELAND A. SEBASTIAN, Primary Examiner

U.S. Cl. X.R.

424—1; 252—301.1 R

4,016,249

We claim:

1. A metabolizable radioactive bone seeking solution for intravenous administration to mammals comprising a technetium-99m-stannous-phosphate complex, the phosphate moiety of which comprises pyrophosphate, said complex being in sterile, non-pyrogenic solution in a pharmaceutically acceptable vehicle at a pH of between 3 and 8, said phosphate moiety containing not substantially more than 25% by weight of linear polyphosphates of formulation $P_nO_{3n+1}^{-(n+2)}$ having a molecular weight greater than pyrophosphate.

2. A solution according to claim 1, said phosphate moiety containing not substantially more than 20% by weight of linear phosphates of formulation $P_nO_{3n+1}^{-(n+2)}$ having a molecular weight greater than pyrophosphate.

3. A solution according to claim 2, said vehicle also containing a pH adjusting agent acceptable for intravenous injection to maintain said pH of 3 to 8, the concentration of the pyrophosphate moiety in said solution being between 0.1 and 5 mg. per milliliter of solution.

4. A solution according to claim 2, any phosphate in said pyrophosphate moiety other than pyrophosphate being selected from the group consisting of a ring phosphate of formula $P_nO_{3n}^{-n}$, orthophosphate and combinations thereof.

5. A method of concentrating $^{99m}Tc$ in vivo in the skeletal structure of a mammal comprising intravenously administering to the mammal a metabolizable radioactive bone seeking composition comprising a sterile, non-pyrogenic aqueous solution of technetium-99m-stannous-phosphate complex, the phosphate moiety of which comprises pyrophosphate and contains no more than 25% by weight of linear polyphosphates of formulation $P_nO_{3n+1}^{-(n+3)}$ having a molecular weight greater than pyrophosphate.

6. A method according to claim 5, said phosphate moiety being substantially free from said linear polyphosphates.

7. A method according to claim 6, wherein said phosphate moiety comprises substantially 100% pyrophosphate.

8. A method according to claim 5, the concentration of said pyrophosphate in said solution being less than 25 mg per kilogram of weight of said mammal.

9. A method according to claim 8, the concentration of said pyrophosphate in said solution being less than 10 mg per kilogram of weight of said mammal and at least the major portion of any phosphate in said phosphate moiety other than pyrophosphate being selected from the group consisting of a ring phosphate of formula $P_nO_{3n}^{-n}$ and orthophosphate and combinations thereof.

10. A method according to claim 9, where $n$ is equal to 3.

11. A method according to claim 5, more than 50% by weight of said phosphate moiety being said pyrophosphate.

12. A method according to claim 8, said phosphate moiety comprising a mixture of said pyrophosphate, a ring phosphate of formula $P_nO_{3n}^{-n}$ and an orthophosphate.

13. A method according to claim 12, wherein $n$ is 3.

14. A method according to claim 8, wherein at least about 90% of said phosphate moiety is said pyrophosphate.

15. A method according to claim 8, at least 1% of said phosphate moiety being pyrophosphate and substantially any remaining phosphate moiety comprising phosphate selected from the group consisting of a ring phosphate of formula $P_nO_{3n}^{-n}$ and orthophosphate and combinations thereof.

16. A method according to claim 8, at least 5% of said phosphate moiety being said pyrophosphate and substantially any remaining phosphate moiety being selected from the group consisting of a ring phosphate of formula $P_nO_{3n}^{-n}$ where $n$ is 3, one or more phosphates of formula $P_nO_{3n+1}^{-(n+2)}$ of which not more than 20% by weight has an $n$ value greater than 2 and combinations thereof.

17. A method according to claim 16, wherein said solution has a pH of between 3 and 8.

18. A method according to claim 17, said solution containing a pH adjusting agent acceptable for intravenous injection to maintain said solution at a pH of 3 to 8.

19. A method of obtaining a radioactive $^{99m}$Tc image of the skeletal structure of mammals for diagnostic purposes comprising the steps of intravenously administering in vivo to the mammal a metabolizable radioactive bone-seeking composition comprising a sterile, non-pyrogenic solution of pH between 3 and 8 in a pharmaceutically acceptable vehicle, of a technetium-99m-stannous-phosphate complex, the phosphate moiety of which comprises pyrophosphate, said phosphate moiety containing no more than 25% by weight of linear polyphosphates of formulation $P_nO_{3n+1}^{-(n+2)}$ having a molecular weight greater than pyrophosphate, followed by exposing said skeletal structure to a gamma ray sensitive device within a time certain after said intravenous administration to observe the radioactive $^{99m}$Tc image of said skeletal structure for diagnostic purposes.

20. A method according to claim 19, said solution containing less than 25 mgs. of pyrophosphate per kilogram body weight.

21. A method according to claim 20, including the step of aseptically admixing a sterile, non-pyrogenic aqueous solution of sodium pertechnetate containing $^{99m}$Tc with a sterile and nonpyrogenic stannous-phosphate complex having a phosphate moiety as claimed in claim 48 to form said technetium 99m-stannous-phosphate complex shortly before said intravenous administration.

22. A method according to claim 20, in which any phosphate in said phosphate moiety other than pyrophosphate is selected from the group consisting of a ring phosphate of formula $P_nO_{3n}$, and one or more phosphates of formulation $P_nO_{3n+1}^{-(n+2)}$, in which $n$ is 2 or less, and combinations thereof.

23. A method according to claim 22, in which at least 5% of the phosphate moiety is pyrophosphate and in which any remaining phosphate is selected from orthophosphate and said ring phosphate and combinations thereof.

24. A method according to claim 21, said pertechnetate solution being a saline solution and being added to said stannous-phosphate complex which is in the form of a freeze dried solid.

25. A method according to claim 20, said phosphate moiety being substantially 100% pyrophosphate.

26. A method of making a metabolizable radioactive bone seeking composition for intravenous administration to mammals comprising admixing a stannous compound with a phosphate, the phosphate moiety of which is pryophosphate to form a stannous-phosphate complex, the phosphate moiety of which is substantially the same as that of said phosphate, said phosphate moiety containing no more than 25% by weight of linear polyphosphates of formulation $P_nO_{3n+1}^{-(n+2)}$ having a molecular weight greater than pyrophosphate, adjusting the pH of the complex to between 3 and 8, sterilizing the complex, adding to the sterile complex a sterile, non-pyrogenic aqueous solution of sodium pertechnetate containing $^{99m}Tc$ to form a $^{99m}Tc$-stannous-phosphate complex for intravenous administration to mammals.

27. A method according to claim 26, said phosphate moiety being substantially free from said linear polyphosphates.

28. A method according to claim 26, the concentration of pyrophosphate in said last mentioned solution being between 0.1 and 5 mg. per liter of solution.

29. A method according to claim 26, at least 5% of said phosphate moiety being pyrophosphate and at least the major portion of any remaining phosphate moiety being selected from the group consisting of orthophosphate and a ring phosphate of formula $P_nO_{3n}^{-n}$ and combinations thereof.

30. A method according to claim 29, where $n$ is equal to 3.

31. A method according to claim 26, substantially 100% by weight of said phosphate moiety being said pyrophosphate.

32. A method according to claim 26, said phosphate moiety comprising a mixture of said pyrophosphate, orthophosphate and a ring phosphate of formula $P_nO_{3n}^{-3}$ wherein $n$ is 3.

33. A method according to claim 26, any phosphate in said phosphate moiety other than pyrophosphate being selected from a ring phosphate of formula $P_nO_{3n}$ and one or more phosphates having the formula $P_nO_{3n+1}^{-(n+2)}$, where $n$ is less than 3, and combinations thereof.

34. A method according to claim 26, at least 50% of said phosphate moiety being said pyrophosphate the remaining phosphate moiety being phosphate selected from a ring phosphate of formula $P_nO_{3n}^{-n}$ and one or more phosphates of formula $P_nO_{3n+1}^{-(n+2)}$ of which not more than 15% by weight has an $n$ value greater than 2, and combinations thereof.

35. A method according to claim 26, wherein said stannous compound and phosphate are water soluble and the steps of admixing them, of adjusting the pH and of sterilizing said stannous-phosphate complex are carried out in a non-oxidizing atmosphere and under non-pyrogenic conditions, said step of admixing said stannous compound and phosphate being in aqueous solution, the water of which has been treated to remove oxygen and other oxidants which might cause oxidation of the stannous ion to a valence state greater than two.

36. A method according to claim 35, said pH adjustment step being carried out by addition of an alkaline pH adjusting agent pharmaceutically acceptable for intravenous injection to maintain said pH of 3 to 8, said sterile and non-pyrogenic stannous-phosphate complex being dried to a solid state and sealed in a sealed container under aseptic conditions and in a non-oxidizing atmosphere prior to admixing the same with said pertechnetate.

37. A method according to claim 36, said aqueous solution of sodium pertechnetate being a saline solution and being added to said stannous-phosphate complex under aseptic conditions, said stannous-phosphate complex being freeze dried.

\* \* \*

4,082,840

We claim:

1. A composition for forming a complex with technetium-99m for radioactive scanning, comprising a stannous-phosphate complex, the phosphate moiety of which comprises pyrophosphate, said phosphate moiety containing no more than 25% of linear polyphosphates of formulation $P_nO_{3n+1}^{-(n+2)}$ having a polyphosphate moiety of molecular weight greater than pyrophosphate, the weight ratio of stannous to pyrophosphate moiety ranging from $10^{-3}$ to 0.50.

2. A composition according to claim 1, in which at least 5% by weight of the phosphate moiety of said complex is pyrophosphate.

3. A composition according to claim 1, said phosphate moiety being substantially free from said linear polyphosphates.

4. A composition according to claim 2, substantially 100% by weight of said phosphate moiety being said pyrophosphate.

5. A composition to claim 1, at least the major portion of any phosphate in said phosphate moiety other than pyrophosphate being selected from the group consisting of a ring phosphate of formula $P_nO_{3n}^{-n}$, orthophosphate and combinations thereof.

6. A composition according to claim 5, where n is equal to 3.

7. A composition according to claim 6, at least 5% by weight of said phosphate moiety being said pyrophosphate and said phosphate moiety containing no more than 10% by weight of said linear polyphosphate of molecular weight greater than pyrophosphate.

8. A composition according to claim 1, said phosphate moiety consisting of said pyrophosphate, a ring phosphate of formula $P_nO_{3n}^{-n}$ and orthophosphate.

9. A composition according to claim 8, wherein $n$ is 3.

10. A composition according to claim 1, at least 90% of said phosphate moiety being pyrophosphate.

11. A composition according to claim 1, at least 1% of said phosphate moiety being pyrophosphate and any remaining phosphate moiety comprising phosphate of the group consisting of a ring phosphate of formula $P_nO_{3n}^{-n}$ where $n$ is 3 and orthophosphate and combinations thereof.

12. A composition according to claim 1, any phosphate in said phosphate moiety other than pyrophosphate being selected from the group consisting of ring phosphate of formula $P_nO_{3n}^{-n}$, one or more phosphates of formula $P_nO_{(3n+1)}^{-(n+2)}$, of which not more than 15% by weight has a $n$ value greater than 2, and combinations thereof.

13. A sterile non-pyrogenic composition according to claim 1, wherein said stannous-phosphate complex is a freeze dried solid packaged in a sealed sterile, non-pyrogenic container purged or oxygen.

14. A composition according to claim 13, said complex containing a pH adjusting agent to provide said stannous-phosphate complex with a pH of between 3 and 8 and being packaged in a nitrogen atmosphere in said sealed sterile, non-pyrogenic container.

15. A sterile, pyrogen free composition for forming a bone seeking complex with technetium-99m according to claim 1, said stannous-phosphate complex being in sterile aqueous solution at a pH of between 3 and 8 for admixture with a sterile pertechnetate solution of technetium-99m to form a technetium-99m labeled stannous-phosphate complex for intravenous administration.

16. A method of preparing a stannous-phosphate complex for use in preparing a complex thereof with technetium-99m comprising admixing a solution of a phosphate with a solid stannous salt, the phosphate moiety of said phosphate comprising pyrophosphate and containing no more than 25% by weight of linear polyphosphates of formulation $P_nO_{3n+1}^{-(n+2)}$ having a molecular weight greater than pyrophosphate.

17. A method according to claim 16, said solid stannous salt being a lyophilized stannous chloride.

18. A method according to claim 16 said step of admixing being carried out in a non-oxidizing atmosphere.

19. A method according to claim 18, said atmosphere being selected from a nitrogen atmosphere and a vacuum.

20. A method according to claim 19, said phosphate solution being formed by admixing the phosphate with water under a nitrogen atmosphere and in a nitrogen flushed container, said method including the step of reducing the oxygen content of said water before forming said solution.

21. A method according to claim 16, including the step of adjusting the pH of said stannous-phosphate complex to a pH suitable for intravenous in vivo administration into the body of a mammal and lyophilizing the resulting stannous-phosphate complex.

22. A composition according to claim 1, wherein said stannous-phosphate complex is a freeze dried solid.

23. A composition according to claim 22, wherein said freeze dried solid is packaged in a sealed, sterile, container.

24. A composition for forming a complex with technetium-99m, comprising a stannous-phosphate complex, the phosphate moiety of which comprises a phosphate selected from the group consisting of (1) pyrophosphate and (2) a ring phosphate having the formula $P_nO_{3n}^{-n}$ and a molecular weight of less than 300, said phosphate moiety containing no more than 25% by weight of linear polyphosphates of formulation $P_nO_{3n+1}^{-(n+2)}$ having a molecular weight greater than pyrophosphate, the weight ratio of stannous to pyrophosphate moiety ranging from $10^{-3}$ to 0.5.

25. A method of preparing a stannous-phosphate complex for use in preparing a complex thereof with technetium-99m comprising admixing a solution of a phosphate with a solid stannous salt, the phosphate moiety of said phosphate being selected from the group consisting of (1) pyrophosphate and (2) a ring phosphate having the formula $P_nO_{3n}^{-n}$, said phosphate moiety containing no more than 25% by weight of linear polyphosphates of formulation $P_nO_{3n+1}^{-(n+2)}$ having a molecular weight greater than pyrophosphate.

26. A method according to claim 16 wherein the weight ratio of stannous to phosphate moiety is between $10^{-3}$ and 0.50.

27. A composition for forming a complex with technetium-99m for radioactive scanning, comprising a stannous-phosphate complex, the phosphate moiety of which comprises pyrophosphate, said phosphate moiety containing no more than 25% of linear polyphosphates of formulation $P_nO_{3n+1}^{-(n+2)}$ having a polyphosphate moiety of molecular weight greater than pyrophosphate, said stannous-phosphate complex being packaged in a sterile sealed container.

28. A composition for forming a complex with technetium-99m for radioactive scanning, comprising a stannous-phosphate complex, the phosphate moiety of which comprises pyrophosphate, said phosphate moiety containing no more than 25% of linear polyphosphates of formulation $P_nO_{3n+1}^{-(n+2)}$ having a polyphosphate moiety of molecular weight greater than pyrophosphate, said stannous phosphate complex being in the form of a freeze dried solid.

29. A composition for forming a complex with technetium-99m for radioactive scanning, comprising a stannous-phosphate complex, the phosphate moiety of which comprises pyrophosphate, said phosphate moiety containing no more than 25% of linear polyphosphates of formulation $P_nO_{3n+1}^{-(n+2)}$ having a polyphosphate moiety of molecular weight greater than pyrophosphate, said stannous-phosphate complex being in sterile aqueous solution at a pH between 3 and 8 for admixture with a sterile technetium-99m solution to form a technetium-99m labelled stannous-phosphate complex.